No. 101,236

STATE OF KANSAS, *Appellee*, v. ASA ADAMS, *Appellant*.
(254 P.3d 515)

Opinion filed April 29, 2011.

*Janine Cox*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is a direct appeal in defendant Asa Adams' first-degree felony-murder case. Adams argues that the district judge

erred in his answer to a jury question and in giving an expert witness instruction and that she received ineffective assistance of counsel, necessitating a new trial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Adams' felony-murder conviction arose out of events on May 16, 2007, when she was home alone with her two children, 1-year-old Shymire and 4-month-old Righteous. Early that evening, Adams placed Shymire in a bath. Ultimately, she called 911 because Shymire needed emergency medical care. Exactly what transpired between was subject to dispute before the district court.

When Shymire reached the hospital, she was treated for head trauma, severe burns to her lower legs and feet, and other injuries. Despite efforts to save her, Shymire was declared brain dead on May 22, 2007, and the court ordered her life support to be terminated on May 24, 2007. Shymire's heart stopped beating soon after.

Adams was charged with first-degree felony murder, predicated upon felony child abuse, as defined in K.S.A. 21-3609. She pleaded not guilty.

The State's theory of the case was that medical evidence established Shymire's cause of death as traumatic brain injury, complicated by severe burns and other injuries, and that Adams was the only person with an opportunity to inflict the injuries. Its evidence consisted of testimony from medical first responders, police officers, an apartment manager, treating physicians, and a medical examiner. The defense theory of the case was that Shymire's injuries resulted from accidents and were unintentionally exacerbated by defendant's untrained effort to resuscitate her daughter. Adams was the only defense witness. Her lack of memory of certain events was attributed to her illegal drug use on the day of Shymire's injuries and the stress of the entire ordeal.

Given Adams' claim that she received ineffective assistance of counsel at her trial, and the requirement that we pass on prejudice, it is necessary to include the following extensive review of the evidence presented to the jury and the evidence supporting Adams' motion for new trial.

The State's first trial witness was Chad Maugans, a paramedic from Sedgwick County EMS. He testified that he and his partner were dispatched to a seizure call at Adams' apartment and arrived there at 5:18 p.m. During the drive, the call was recategorized to a choking injury. Upon his entry into the apartment, he testified, Shymire was seated on the couch and had little to no consciousness. She was staring ahead of her, making no noises. Maugans noticed burns on her leg and feet and observed mucus in her nose and mouth, although she was breathing. He cleared her airways. As she was being moved to the ambulance, Maugans notified the hospital that it had a burn victim on her way. On route, Maugans said, he continued to treat Shymire and noticed petechial hemorrhages in her eyes and ligature marks around her neck, injuries usually associated with asphyxiation or strangulation. He also observed abrasions on Shymire's head.

On cross-examination, Maugans testified that Adams stood quietly by and watched his and his partner's efforts to treat Shymire. He said that Adams appeared to be in shock or stunned. His dispatch computer indicated Adams had been frantic when she called 911.

The State's second witness, Sherri Rene Brown, was Maugans' partner. She testified that her efforts to gather information from Adams at the scene were futile. She got no responses to any of her questions.

The State's third witness, Josh Mullen of the Wichita Fire Department, testified that he also responded to Adams' 911 call. He observed Shymire on the couch, observed her severe burns, removed mucus from her nose and mouth, and determined that she had a low level of consciousness.

The State's next witness, Wichita police officer Ian Wolfe, became involved in the case when he made contact with Adams shortly after she arrived at the hospital. Adams confirmed that she had been home alone with her two children and was able to respond to his questions logically and coherently. According to Wolfe, Adams said that she had not wanted to leave Shymire alone in the bathtub, that Shymire had had a seizure, and that Adams then moved Shymire to the couch and noticed Shymire's skin was

falling off her lower legs. Wolfe testified that Adams told him Shymire had been seated in the bathtub. Wolfe also testified that Adams expressed a lack of understanding of a doctor's comments about burns on Shymire's legs, explaining that the injuries on her legs were the result of sensitive skin or some kind of skin disorder.

Wichita police officer Naomi Arnold was the State's next witness. She was responsible for keeping Adams' apartment clear for investigation, and she walked through the apartment and went into the bathroom. When she opened the bathroom door, she said, the room felt like a sauna; she put her finger in the tub and felt hot water in it.

Kent Bauman, another Wichita police officer with the Exploited and Missing Children Unit, testified next. He too went to Adams' apartment on May 16, 2007. He stated that he did not notice any bath towels, lotions, or baby soaps set out in the bathroom when he entered it, nor did he notice any standing water on the bathroom floor. He said that he had arrived about 8 p.m., and there was no water in the bathtub at that time. He ran each of the bathtub faucets for 30 seconds to 60 seconds and measured the temperature of the water at 138 degrees.

The State's next witness, Frank Johnson, was the on-site apartment manager of the complex in which Adams lived. Johnson testified that he observed Robert Turner, Adams' common-law husband and the children's father, leave the complex on his bicycle at approximately 12:30 p.m. on May 16, 2007. The parties stipulated that Turner clocked into his job at 12:49 p.m. and clocked out at 9:42 p.m. on that day. At about 6 p.m. on May 16, 2007, Johnson testified, he received numerous calls from Adams, instructing him not to allow police to enter her apartment.

Jonathan Dort, Chief of Surgery at St. Francis Hospital, testified next. Dort was part of the emergency room trauma team that treated Shymire on her arrival at the hospital. Dort observed that Shymire was poorly responsive, somnolent, and not alert. She was not scared or crying like a normal child with her burn injuries would be. He observed no signs indicating that she had suffered a seizure. A CAT scan showed small hemorrhages to Shymire's brain. It also showed fluids and stomach contents in her chest and in her

lungs, which was evidence of aspiration. Dort observed bruises on Shymire's abdomen and testified that they were not consistent with an effort to resuscitate her. Dort said that, while he treated Shymire in the ER, he suspected that the injuries were not accidental, because the combination of burns, head trauma, and marks on the neck could not be attributed to a single cause or mechanism. Defense counsel did not cross-examine Dort.

Pediatrician Katherine Melhorn, M.D., testified next for the State. She said that she specialized in child abuse evaluations. She visited Shymire in the hospital the day after she arrived, read Shymire's medical history, and concluded that Shymire did not have a seizure disorder. Melhorn also concluded that Shymire's injuries could not have been caused by a short seizure and that there was nothing to indicate any preexisting health issue that could have caused her injuries. Melhorn described the injuries to Shymire's lower legs and feet as inflicted immersion burns. Shymire also had bruises on her legs and torso resulting from inflicted blunt force trauma and three bruises behind her right ear resulting from blunt force trauma. She had a bruise and abrasion on her forehead, which Melhorn was less certain about; but she testified they too had probably been caused by blunt force trauma. Shymire's internal brain damage resulted from a closed head injury caused by blunt force trauma. In Melhorn's opinion, the burns on Shymire's legs may have contributed to Shymire's death, but the ultimate cause of death was marked swelling to brain tissue. On cross-examination, Melhorn conceded that her conclusions did not rule out the occurrence of a seizure on May 16, 2007. On redirect, she said she could not conceive of a sensible, single mechanism for all of Shymire's injuries, but Shymire could have had a seizure as a result of the brain injury.

Doctor William Waswick, a surgeon and specialist in trauma and burns, testified next. He treated Shymire on the day she arrived at the hospital. Waswick stated that Shymire had second- and third-degree burns on her legs and feet. A small area would have required skin grafting to heal, but most of the burns would have healed without grafting. Waswick also testified that burns such as those to Shymire's legs would be "exquisitely painful," and that the

burns alone would not have caused Shymire's observed low-consciousness state. He said that the burns were consistent with forced immersion injuries, not accidental burns, because there were no splash burns to other parts of Shymire's body. On cross-examination, Waswick testified that 3 seconds to 5 seconds underwater would have been enough time to have caused Shymire's burns. In addition, minor burns on Shymire's chest and cheek were consistent with the toddler climbing or being pulled out of the tub.

Jaime Oeberst, chief medical examiner for the Wichita Police Department and county coroner, performed an autopsy on Shymire's body the day after her heart stopped and was the next witness during the State's case in chief. Oeberst had ultimately concluded that Shymire's cause of death was complications from blunt force trauma to the head and abdomen and from the burns. He had ruled that the manner of death was homicide. On cross-examination, Oeberst stated that the petechial hemorrhages in Shymire's eyes and chest may have resulted from periods of distressed breathing. On redirect examination, Oeberst testified that blunt force trauma to the head would have resulted in a visible change of the state of the child's consciousness.

Clay Germany, a Wichita police detective with the Exploited and Missing Children Unit, was the State's next witness. He testified that he interviewed Adams at the hospital on May 16, 2007. He also interviewed her at the EMCU offices. The State played two DVDs of the police interviews.

William Alexander Riddle, a detective with the Wichita Police Department's Exploited and Missing Children Unit, was the State's last witness. He testified that he learned from doctors at St. Francis that Shymire was suffering from bleeding in the brain. During interviews with Adams, Riddle said he and other detectives asked Adams to explain how Shymire's head injury occurred. He said that Adams denied ever hitting Shymire and said that a wall mirror had fallen on Shymire's head earlier in the week and may have caused the head injury.

Defense counsel did not make an opening statement.

Adams testified that she was 19 years old and had moved to Wichita from North Carolina with Turner and their two children

in March 2007. She described her life in Wichita as a stay-at-home mother, struggling with finances as her husband sought work. Turner worked evenings, and she had full responsibility for caring for the children at all times of the day. Adams said, "I was tired all the time. Stressed. I was just exhausted." She also acknowledged that she was being physically, emotionally, and mentally abused by her husband.

On May 16, 2007, Adams testified, her husband went to work around noon and she was alone with her children for the afternoon and evening. Righteous, the baby, was abnormally fussy. Adams was operating on 3 hours of sleep from the previous night and some short naps. She ingested Ecstasy, marijuana, Lortabs, and cocaine to "get my mind off of what was going on around me and what I was going through." She followed her normal routine with the children, feeding them dinner, then giving them each a bath.

Adams said that she gave Righteous a bath first, then moved him to the crib in the living room. She started a bath for Shymire, failing to bring anything but a towel into the bathroom with her because she was distracted by Righteous' crying. She tested the water and thought it was fine, put Shymire into the tub, and sat in the bathroom with her until she heard Righteous screaming in the living room. She went to the living room to comfort Righteous and heard a thud from the bathroom. Shymire then walked out into the living room. Adams testified that she put Righteous back down into the crib, picked up Shymire, carried her to the bathroom, and put her back into the bathtub in a standing position. The water was still running, and Shymire started screaming. Adams said she observed Shymire "began to wander to the ceiling, and I asked her, Shymire, what's up there . . . . And then she began to jerk and then she just flew back." Adams testified that she thought she had caught Shymire but it was possible she nevertheless hit her head in the bathtub. She acknowledged she heard a thud and immediately picked Shymire up.

When Adams picked Shymire up, she testified, she noticed the water was much hotter than it was when she first put Shymire in the tub. She also testified that she noticed Shymire's feet were scalded and that she was not responding or making any sounds.

Adams said she took Shymire to the living room and put her on the couch, and she observed mucus coming from Shymire's mouth and nose. Adams said she tried to perform CPR, but she acknowledged that she had no training in how to do so. She described her efforts at CPR as thrusts to Shymire's abdomen. Adams then called 911.

Adams said she was in a state of shock when emergency personnel arrived. She testified that she did not tell the detectives about the burns on Shymire's legs because she had not seen them at the time. She also said that she was worried throughout the police interviews that she might be deemed unfit and have her children taken from her. She said this was the reason she failed to tell the 911 dispatcher and detectives that she left Shymire alone in the tub and failed to mention her drug use. Adams believed Shymire was capable of manipulating the tub water faucets, but she had never observed her turn them before.

On cross-examination, Adams said that the reason investigators found no drugs at her apartment was that she had used them all and then cleaned. She also testified that she did not recall shutting the bathroom door or pulling the stopper on the bathtub. She did recall telling detectives that she was emotionally well and would not have been caring for her kids alone if she could not handle them. The prosecutor also asked questions emphasizing discrepancies between the evidence in the police interview DVDs and Adams' testimony on direct, including her earlier statement that she had lotions and powders with her in the bathroom. The prosecutor also questioned Adams about Righteous' behavior while the EMS personnel were in the apartment. She had testified on direct that Righteous was very fussy and was crying constantly. On cross-examination, Defendant testified that he was quiet when the paramedics were there, although he had been very noisy all day. The prosecutor also read from the transcript of the police interview in which Adams had said that Shymire splashed water when she began to fall backwards and that there may have been water on the bathroom floor. Adams acknowledged that Shymire had no burns except on her lower legs and feet. She testified that she did not

strike Shymire in the head or thigh and that she had no intent to harm Shymire while performing abdomen thrusts.

When instructing the jury, the district judge used the weight and credibility instruction from PIK Crim. 3d 52.09 but added a second paragraph about expert testimony from PIK Civ. 4th 102.50. The expanded instruction read:

"It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified.

"Certain testimony has been given in this case by experts; that is, by persons who are specially qualified by experience or training and possess knowledge on matters not common to mankind in general. The law permits such persons to give their opinions regarding such matters. The testimony of experts is to be considered like any other testimony and is to be tried by the same tests, and should receive the same weight and credit as the jury deems entitled to, when viewed in connection with all the other facts and circumstances, and its weight and value are questions for the jury."

The court said that the modified instruction told jurors that they were "to consider expert witnesses by the same standard" used for any witness. Defense counsel objected because the instruction was not "standard PIK." The judge overruled the objection, finding the modified instruction "helpful for the jury."

Jurors asked two questions during their deliberations. The first jury question was: "Did the Specialist ? [] say the blow to the back of the head would/could have caused instant inc[a]pacit[at]ion?" A typewritten document in the record on appeal, signed by the district judge and both counsel, reflects the following response by the court:

"The Court reminds the jury that they are the trier of the facts. It is their perception and recollection of testimony that should control their deliberations, not counsel[']s. The Court will advise the jury that, should they desire it, it is possible to have that portion of the Doctor's testimony read back to them.

"Counsel agree that the specialist, Dr. Oeberst, testified in essence, that the head trauma would have caused the brain to swell within a very short time but did not provide specific time estimates. She further testified that, once the brain swelling started, it would have caused an immediate and noticeable change of consciousness."

When the jury had completed its deliberations, but before it was brought into court for the reading of its verdict, the prosecutor stated the following on the record:

"[T]here was a question the jury asked. Counsel considered the questions with the Court. [Defense counsel] was given an opportunity along with his client to speak privately about that. They did before all the parties came back in chambers and agreed to the question response to be given to both questions. The response was reduced to a typewritten form and all parties signed it, and it was answered in that fashion to the jury.

"The question and the answers, I think it may have been a part of the record already, but I just wanted in the record that [defendant] Ms. Adams was allowed plenty of time to confer with counsel prior to the answer being given."

The district judge then asked defense counsel whether he agreed with the prosecutor's recitation, and defense counsel said "I do." Nothing in the record on appeal reflects whether Adams was present during any discussion by the court and counsel of the jury questions and responses.

After the guilty verdict but before sentencing, Adams wrote a letter to the district judge. It read in pertinent part:

"I am writing you because I would like to know what I need to do to get a new attorney. I felt that I was not represented properly. There are a lot of facts to my case that were not mentioned w[h]ich I believe would help my case. I refuse to accept the fact that I have been found guilty for something that I did not do. I am aware of the severity of my case. That is why I'm asking you to appoint another attorney to my case."

The judge construed the letter as a motion for appointment of new counsel and a motion for new trial on the basis of ineffective assistance of trial counsel. He appointed the requested new counsel and conducted an evidentiary hearing on the motion for new trial.

At that hearing, Adams testified that many facts were not mentioned at her trial. She also said that she believed she had inadequate opportunities to discuss her case with her trial counsel. She said she had wanted him to put on evidence of Battered Woman's Syndrome and had wanted him to subpoena her husband to testify about the abuse and hardship she was suffering at the time of Shymire's injuries. Adams also said that she had wanted her trial

counsel to present medical records of her children showing no history of abuse, but she conceded that she did not give her counsel any contact information for medical providers. Adams also testified that she had wanted her trial counsel to call character witnesses and put on evidence of her successes in high school. She further testified that she was not able to understand what was going on at the time of trial and had felt forced to testify in her own defense. She stated that her counsel did not threaten her but that "[h]e just said that I don't have a choice."

Adams also presented documents establishing that Shymire was a child in need of care (CINC) from the time of her injuries until the termination of her life support. She testified that she had wanted her counsel to present the CINC documents at trial to demonstrate that she was not permitted to make the life support termination decision ordinarily allocated to a parent. Adams asserted that this should have absolved her of first-degree murder.

Adams also testified on direct that she could have given her counsel photographs that illustrated her loving relationships with her two children and that he should have filed a motion to suppress certain of the statements she had made during police interviews. She also said that she had not wanted to admit using drugs and that she had made this clear to her counsel. She said she did not know whether her trial counsel had filed any proposed jury instructions.

On cross-examination, Adams conceded that she was not alleging that her husband killed Shymire. She also admitted that she had told the jury she had a rocky relationship with Turner. Adams further testified that she had received mental health treatment when she was about 12 years old in North Carolina, but could not recall the diagnosis or form of treatment. Adams also testified that she suffered from a mental disability that made it difficult to remember things; she did not know the name of the malady.

Adams' trial counsel, Kenneth Newton, also testified at the hearing on the motion for new trial. He said he had worked for the Sedgwick County Public Defender's Office for about 12 years and had defended five to eight murder cases. He further testified that he had had a pediatrician with expertise in neurology review Shy-

mire's medical records. That doctor concluded that there was a 2-hour time lapse between the occurrence of Shymire's head injuries and the time Adams called 911. This evidence eliminated Turner as a suspect. The pediatrician also told Newton that he would not testify to any reasonable degree of medical certainty that Shymire's injuries could have resulted from an accidental slip and fall. Under these circumstances, Newton said, he could not put the doctor on the stand before the jury.

Newton further testified that he did not call Turner to testify because he was difficult to reach, missed appointments to come in to discuss the case, and posed too great a risk that he would invoke his privilege against self-incrimination on the stand because of Adams' abuse allegations. Newton also considered calling Adams' mother to testify, but he and Adams decided as trial neared that it would be better not to do so. Newton did not recall that Adams ever mentioned suffering from a mental disability, and he never had the impression that Adams was not competent to stand trial.

Newton also testified that he did not attempt to put photographs of Adams with her children into evidence because controlling case law did not support their admissibility. He did not offer medical records of Shymire's previous medical treatment because they contained damaging evidence—specifically, documentation that Adams had engaged in inappropriate behavior during an infant Shymire's visit to an emergency room and that Shymire had been malnourished. Newton made a strategy judgment not to sponsor such evidence because it would hurt Adams' case and portray her as a "neglectful mom," a characterization she had made clear she wanted to avoid.

Newton further testified that he believed he had spent adequate time discussing the case with Adams. He said he could not be sure whether he submitted proposed jury instructions to the district court. Newton also said that he did not force Adams to testify. She had insisted that she wanted her story to be heard; and he told her that there was no way for that to happen if she did not testify.

The district judge denied the motion for new trial based on ineffective assistance of trial counsel, relying on *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984),

and *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985). Adams was sentenced to life imprisonment with parole eligibility in 20 years.

## HANDLING OF JURY QUESTION

Defendant argues that the district judge erred both procedurally and substantively in responding to the jury's question during deliberations. Procedurally, the judge should not have provided a written response that summarized a portion of a witness's testimony; rather, he should simply have offered a readback of the testimony. Substantively, Adams argues, the judge's summary was inaccurate.

The standard of review for a trial court's response to a jury question during deliberations is abuse of discretion. *State v. Hoge*, 276 Kan. 801, 815-16, 80 P.3d 52 (2003) (citing *State v. Moore*, 274 Kan. 639, 643, 55 P.3d 903 [2002]). The State points out, however, that Adams invited this error by acquiescing in the trial court's handling of the question. If so, the question is not reviewable. See *State v. Prouse*, 244 Kan. 292, 298-99, 767 P.2d 1308 (1989).

The invited error doctrine has been applied in reviewing a district judge's compliance with the statutory procedures governing jury questions. *State v. Bruce*, 255 Kan. 388, 397, 874 P.2d 1165 (1994); *State v. Cramer*, 17 Kan. App. 2d 623, 632-33, 841 P.2d 1111 (1992). K.S.A. 22-3420(3) provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

The court has construed this provision to require the defendant's presence for any discussions about a jury's questions and "[w]here the record does not affirmatively reflect the presence of the defendant, this court will presume that the defendant's constitutional right to be present was violated and that K.S.A. 22-3420(3) was not followed." *State v. Betts*, 272 Kan. 369, 391, 33 P.3d 575 (2003) (citing *State v. Bell*, 266 Kan. 896, 920, 975 P.2d 239 [1999]). This

*Betts* court has further noted that invited error doctrine would not apply to an allegation that defendant's right to be present during jury question discussions was violated, because this is a right personal to the defendant. *Betts*, 272 Kan. at 392; see *State v. Bolton*, 274 Kan. 1, 5, 49 P.3d 468 (2002). But harmless error analysis does apply. 272 Kan. at 391-92.

In this case, Adams does not argue that her right to be present was violated. This is wise because, although the record is less than crystal clear, it is not silent. The prosecutor's comments on the record show that she participated at least in a discussion of the jury's question and the response with her counsel. This makes her situation analogous to that of the defendants in *State v. Bruce* and *State v. Cramer*.

In *Bruce*, this court applied the invited error doctrine to the defendant's objection on appeal to the court's response to a jury question. 255 Kan. at 397. The record indicated that the defense counsel agreed to the response that the court, with input from the prosecution and defense, formulated in open court. Because the defendant participated and, in fact, joined in the request for specific language, defendant could not argue for error before this court. *Bruce*, 255 Kan. at 397. Similarly, in *State v. Cramer* the Kansas Court of Appeals applied the invited error doctrine to a defendant's argument that the district court improperly responded to a jury's question. 17 Kan. App. 2d at 631-32. Defense counsel stated on the record that he had no problem with setting out the standard suggested by the prosecutor. It was just that standard that both parties agreed to that the court used to answer the question. Because of the defendant's on-the-record agreement to the answer, he could not argue the error on appeal. 17 Kan. App. 2d at 632-33 (citing *State v. Salton*, 238 Kan. 835, 837, 715 P.2d 412 [1986]; *State v. Falke*, 237 Kan. 668, 682, 703 P.2d 1362 [1985]; *State v. Reynolds*, 230 Kan. 532, 535-36, 639 P.2d 461 [1982]).

It would be better practice, in future cases, for the district judge to take special care to deal with jury questions only in open court and to ensure a recording of the presence of the defendants as well as the prosecutor and defense counsel. In addition, a judge who summarizes testimony rather than merely offer a readback, plays

with fire. See *Betts*, 272 Kan. at 393 (error to summarize but harmless). However, on the record in this case, we are satisfied that Adams invited any error that may have occurred in the district judge's handling of the jury's question. We therefore decline to review her procedural and substantive complaints.

## WITNESS CREDIBILITY INSTRUCTION

Adams next contests the propriety of the district judge's instruction on the credibility of witnesses, which went beyond the wording of PIK Crim. 3d 52.09. The district judge declined to heed the Advisory Committee's recommendation in the comment to PIK Crim. 3d 52.14, which says no separate instruction about expert witnesses should be given. As set forth above, the judge added language regarding experts borrowed from PIK Civ. 4th 102.50. Adams' counsel objected to this instruction at trial on the ground that it deviated from the standard pattern instruction for Kansas. Although this is true, such deviation is not automatically fatal. Use of PIK instructions is encouraged but not mandatory. If the particular facts of a case require modification of a pattern instruction, the court should not hesitate to change it. See *State v. Gallegos*, 286 Kan. 869, 190 P.3d 226 (2008) (citing *State v. Mitchell*, 269 Kan. 349, Syl. ¶ 4, 7 P.3d 1135 [2000]).

This court has acknowledged, however, a trend away from instructions that focus on the credibility of certain witnesses. *State v. Willis*, 240 Kan. 580, 587, 731 P.2d 287 (1987). The Advisory Committee Notes on Use also demonstrate this trend. See PIK Crim. 2d 52.10 (defendant as witness); PIK Crim. 2d 52.11 (number of witnesses); PIK Crim. 2d 52.14 (expert witness); PIK Crim. 2d 52.15 (impeachment). This goes to the essence of Adams' argument on appeal; she asserts that the district judge's instruction put undue emphasis on the four experts' trial testimony.

We acknowledge that the notes to the PIK Criminal instruction and the PIK Civil instruction used here counsel against inclusion of a supplemental expert witness instruction. PIK Crim. 3d 52.14 Comment ("The Committee believes that an expert should be considered as any other witness as set forth in PIK 3d 52.09, [Crim.] Credibility of Witnesses."); PIK Civ. 3d 102.50 Notes on Use

("While this instruction may be requested, the Committee discourages its use."). But it appears in this case that, if anything, the hybrid instruction was intended to de-emphasize the weight and credit of the expert witnesses' testimony. Its plain language discouraged jurors from being overly impressed with the expertise and official positions of those testifying during the State's case-in-chief. In a case where, as here, the nonexpert defendant is her only witness, as a matter of common sense, the hybrid does no harm and may actually help.

Moreover, our legal standard for assessing jury instructions requires that we view them as a whole and determine whether they accurately state the law so the jury could not reasonably have been misled by them. See *Gallegos*, 286 Kan. at 877 (citing *State v. Wilkerson*, 278 Kan. 147, 158, 91 P.3d 1181 [2004]). On this standard, Adams' claim fails.

The instruction accurately stated the law as it stands in Kansas. The jury should weigh expert witness testimony in the same manner it weighs all testimony. See PIK Civ. 3d 102.50, Notes on Use ("The essence of the instruction is nothing more than a statement justifying the decision of the trial judge to allow a supposed expert to testify more broadly than an ordinary witness is allowed to testify."). The State laid a proper foundation for all of its expert medical witnesses, making the jury well aware of their qualifications to give opinions on medical issues and cause of death.

In addition, Adams' jury would not reasonably have been misled by the instruction. Had the first paragraph of the hybrid stood alone, the jury still would have been instructed as to how to assess credibility of all witnesses, regardless of expertise. The effect of the second paragraph on experts was merely cautionary. Again, it guarded against a likely misimpression about the influence of experts. The district judge was justified in adding the second paragraph because it was helpful to the jury.

In sum, although the district judge deviated from the standard jury instructions on witness credibility, doing so was not error in this case. Any practical effect would have worked to Adams' benefit, and the instructions as given were fair and accurate statements of the law that would not reasonably have misled the jury.

## MOTION FOR NEW TRIAL BASED ON INEFFECTIVE ASSISTANCE

Adams' last argument on this appeal is that the district judge erred in denying her motion for new trial based on ineffective assistance of trial counsel. A claim alleging ineffective assistance of counsel presents mixed questions of law and fact requiring de novo review. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009). When a district judge has held a full evidentiary hearing on the issue, this court determines whether the district judge's factual findings are supported by substantial competent evidence and whether those findings are sufficient to support the trial court's conclusions of law. See *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007).

To establish reversible error, Adams must meet the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984); see also *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting the *Strickland* holding). The test requires a defendant to show: (1) counsel committed serious errors that undermined the Sixth Amendment's guarantee to effective assistance, and (2) counsel's deficient performance prejudiced the defendant. 466 U.S. at 689-96; *Harris*, 288 Kan. at 416.

The first prong of the *Strickland* test requires a finding that trial counsel's representation fell below an objective standard of reasonableness. *Chamberlain*, 236 Kan. at 656-57. The sphere of permissible, reasonable professional conduct is broad, and courts are highly deferential in their assessment of attorney performance. There is a strong presumption that counsel's representation fell within the wide range of professional conduct. *Harris*, 288 Kan. at 416. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004) (citing *Strickland*, 466 U.S. at 690-91.) The burden is on a defendant to demonstrate that the alleged deficiencies were not the result of strategy.

*Gleason*, 277 Kan. at 644 (citing *Ferguson v. State*, 276 Kan. 428, 446, 78 P.3d 40 [2003]).

The second prong of the *Strickland* test requires a defendant to show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Chamberlain*, 236 Kan. at 656-57.

Adams cannot meet either prong of the *Strickland* test.

At the evidentiary hearing on Adams' motion for new trial, both she and her trial counsel testified about the alleged defects in his representation. Their testimony demonstrated that Newton's performance was well within the bounds of competent, professional representation. Indeed, his concession to several of the additional demands Adams placed on him would have been detrimental to her interests. In other words, he exercised exactly the judgment counsel is meant to exercise, including judgment designed to save the client from himself of herself. Under the circumstances presented here, the district judge's findings on *Strickland*'s first-prong were amply supported by substantial competent evidence and those findings were sufficient to support the judge's conclusions of law.

The situation is likewise on the second prong of *Strickland*. Shymire's injuries were catastrophic. The State's case against her mother was powerful. Even if we perceived weakness in Newton's performance, which we do not, there was no prejudice flowing from it. There was virtually no chance the jury could have concluded other than it did.

In view of all of the foregoing discussion, Adams' claims of error on this appeal are rejected, and her conviction of first-degree felony murder is hereby affirmed.

DAVIS, C.J., not participating.

PHILIP C. VIEUX, District Judge, assigned.