NOT DESIGNATED FOR PUBLICATION

No. 112,468

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LAMONTE D. JAMES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed May 13, 2016. Affirmed.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Jennifer S. Tatum*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J, LEBEN and POWELL, JJ.

*Per Curiam*:  Lamonte D. James was convicted of three counts of aggravated indecent liberties with a child and three counts of criminal sodomy. He appeals from the district court's decision to deny his motion for a new trial. First, he argues he received ineffective assistance of counsel. Second, he argues the district court committed reversible error by excluding evidence relating to a witness' alleged extramarital affair. Finally, he argues cumulative errors require the reversal of his convictions. Because we find the district court did not abuse its discretion in denying James' motion for new trial, we affirm.

1

James met L.B. for the first time in June 2010. The two met in church. James later contacted L.B. via Facebook and telephone. At some point in that month, James asked L.B. to go on a date. L.B. responded she did not think her mom would be supportive of the idea due to their ages. In a later phone call, L.B. told James she was 15 years old, and James told L.B. that he was 24 years old.

In June 2010, about 2 weeks after they met, James and L.B. agreed that James should come to L.B.'s house to have sex. They chose L.B.'s house because L.B.'s mother (Mother) would not be there, and her stepfather likely would be asleep. When James arrived, he and L.B. had a small conversation and then engaged in vaginal intercourse. James left the house immediately after having sex with L.B. The next day, the two met again at L.B.'s house. This time, James first put his mouth on L.B.'s vagina and then the two engaged in vaginal intercourse again. After this second sexual encounter, James and L.B. decided to become boyfriend and girlfriend and continued to have sex.

According to L.B., James told her to keep their relationship secret. He told her not to talk to her friends or anyone about the two of them and told her not to post anything on Facebook about their relationship. He told L.B. that there was a possibility he could go to jail if she did not keep it a secret. James said they could make the relationship public after L.B. turned 16 or 17. At trial, L.B. testified about 21 private Facebook messages she received from James, all which were sent prior to L.B. turning 16 years old.

At some point during the summer of 2010, L.B.'s younger half-sister, D.R., came to visit L.B. from Georgia. L.B. and D.R. stayed at their biological father's house together. L.B. told D.R. that she was "talking to somebody new" and that it was James. D.R. testified that one night during that stay, L.B. left the house to go have sex with

2

James. L.B. testified that she and James went to James' parents' house that night and engaged in both oral and vaginal sex.

L.B. said she and James did not go out in public together until she turned 16. She turned 16 in September 2010. The two dated on and off for a total of 2 1/2 years. They would meet up together one to three times a week. L.B.'s parents did not know she was seeing James at any point during this time period.

On July 31, 2012, Mother and L.B. went to the report desk of the Kansas City, Kansas, Police Department. L.B. was 17 years old at the time. Sophia Barajas, an employee of the police department, interviewed Mother and L.B. in separate rooms. Mother told Barajas that L.B. had begun an inappropriate sexual relationship at the age of 15. Barajas next tried to speak to L.B., but L.B. was uncooperative.

James ultimately was charged with three counts of aggravated indecent liberties with a child and three counts of criminal sodomy. Dwight Alexander and Joshua Seiden represented James at trial as co-counsel. The State called witnesses at trial to testify to the facts set forth above. James did not testify and did not call any witnesses to testify on his behalf. On January 28, 2014, the jury found James guilty of all six counts against him.

On February 10, 2014, James filed a posttrial motion for new trial. On April 3, 2014, before the district court had ruled on the motion for a new trial, James filed another posttrial motion. This second motion was filed by James pro se and alleged that he had been deprived of a fair trial due to ineffective assistance of counsel by his attorneys. Given these allegations, the court granted motions to withdraw filed by both Alexander and Seiden. On April 29, 2014, Michael Page Jr., filed an entry of appearance in the case. Page filed an amended motion for a new trial, which included claims of ineffective assistance of counsel.

A hearing on James' motion for a new trial, as amended, was held on June 20, 2014. Four witnesses testified at the hearing: Alexander, Seiden, James, and James' mother, Stephanie James (Stephanie). At the end of the hearing, the district court denied James' motion for new trial. James ultimately was sentenced to serve 118 months in prison.

ANALYSIS

On appeal, James argues the district court erred by denying his motion for a new trial. We review a trial court's ruling on a motion for a new trial for an abuse of discretion. *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 (2012). A judicial action constitutes an abuse of discretion if the action

> "(1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]" *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

James appears to argue that the district court abused its discretion by basing its decision on an error of law, which is the second factor listed above. Specifically, James asserts the district court erred as a matter of law by rejecting his claim of ineffective assistance of counsel and erred as a matter of law by excluding relevant evidence favorable to his theory of defense. And even if the two separate errors of law do not compel us to reverse the district court's decision, James finally asserts he is entitled to a new trial based on the cumulative error doctrine. We address each of James' assertions below.

4

1. *Ineffective assistance of counsel*

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. Appellate courts review the underlying factual findings for support by substantial competent evidence and the legal conclusions based on those facts de novo. *State v. Cheatham*, 296 Kan. 417, 430, 292 P.2d 318 (2013). Substantial evidence is such evidence that a reasonable person might accept as sufficient to support a conclusion. *State v. Jolly*, 301 Kan. 313, 325, 342 P.3d 935 (2015). On review for substantial evidence, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or substitute its evaluation of the evidence for that of the district court. Further, this court must accept as true all evidence and inferences drawn from the evidence that support or tend to support the district court's findings. *State v. Brown*, 300 Kan. 542, 546, 331 P.3d 781 (2014).

To support a claim of ineffective assistance of counsel based on counsel's performance, a defendant first must demonstrate that counsel's performance was deficient and then must demonstrate that the deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. *Edgar v. State*, 294 Kan. 828, 837, 283 P.3d 152 (2012). In order to show an attorney's performance was deficient, a defendant must "demonstrate counsel's representation fell below an objective standard of reasonableness, considering the entire circumstances attendant to the case." *Cheatham*, 296 Kan. at 431. To demonstrate prejudice, a defendant must show that there was a reasonable probability that, but for the deficient performance, the result of the trial would have been different. 296 Kan. at 432. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Miller v. State*, 298 Kan. 921, 934, 318 P.3d 155 (2014).

On appeal, James argues the district court erred as a matter of law by finding that his attorneys performed satisfactorily and that he received a fair trial, even though he

5

presented sufficient evidence at the hearing below to establish that his attorneys (a) failed to investigate potential witnesses and then call the witnesses to testify at trial; (b) failed to introduce evidence at trial that James had provided to them; (c) advised him not to testify at trial; (d) failed to secure an unbiased jury; and (e) failed to request a preliminary hearing.

a. *Failing to investigate witnesses and then call the witnesses to testify at trial*

James argues that his trial attorneys' performances were deficient because they failed to investigate witnesses whose testimony at trial would have supported James' theory of defense and, in turn, call the witnesses to testify on his behalf at trial. "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' [Citations omitted.]" *State v. Adams*, 292 Kan. 151, 167-68, 254 P.3d 515 (2011). The defendant has the burden to establish that the deficiencies alleged were not the result of strategy. 292 Kan. at 168.

As a general rule, determining which witnesses should testify at trial is a strategic decision that lies within the exclusive province of an attorney after consultation with his or her client. *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). With that said, an attorney may not "disregard pursuing a line of investigation and call it 'trial strategy.'" *State v. James*, 31 Kan. App. 2d 548, 554, 67 P.3d 857, *rev. denied* 276 Kan. 972 (2003). In this case, there is no dispute here that the strategic theory of James' defense was to persuade the jury that James did not have a sexual relationship with L.B. while she was 15 years old.

James testified at the posttrial hearing that he gave Alexander and Seiden specific names and phone numbers of witnesses who would testify that James did not start a

sexual relationship with L.B. until after she was 16 years old but that the attorneys never contacted any of these potential witnesses. First, James testified he told his attorneys that his younger brother Jesse was a potential witness because Jesse would testify he wrote some of the Facebook messages that were admitted into evidence at trial. James also testified he told his attorneys about Christian Hussie, a good friend of James' from church. Hussie would have testified that he was part of a three-way phone conversation during which L.B. admitted that her sexual relationship with James started after she had turned 16. James testified he also told his attorneys about S.H., a friend of L.B.'s, who would have testified that L.B.'s sexual relationship with James started after she turned 16. In addition, James advised his attorneys that his mother, Stephanie, and his sister could testify that James and L.B. never had sex at James' house. Finally, James said that there was a woman at church who could testify that L.B. told the woman's daughter that L.B. thought James was sexy. James admitted, however, that he did not provide this woman's name to his attorneys.

Alexander and Seiden each testified at the posttrial hearing that, although James generally told them about numerous witnesses that he believed might be favorable to his defense, James failed to provide any specific names to them other than the names of Jesse and Stephanie. Although this is consistent with James' testimony that he did not provide the name of the woman at the church, it is inconsistent with James' testimony regarding the other five witnesses James said he identified by name: Christian, S.H., Jesse, James' sister, and Stephanie. The district court did not make any credibility findings to resolve this discrepancy in the evidence, nor did it directly address James' claim that his attorneys failed to investigate these potential witnesses. Based on the evidence presented at trial, however, the district court's failure in this regard does not preclude us from deciding whether the district court erred in denying James' ineffective of assistance counsel. To that end, we will presume for purposes of our decision today that James identified by name, and provided contact information for, the five witnesses listed above and that his attorneys' failure to investigate or follow-up on those witnesses fell below an objective

7

standard of reasonableness. Notwithstanding our presumption in this regard, James has failed to establish the prejudice component of an ineffective assistance of counsel claim: a reasonable probability that, but for his attorneys' failure to follow-up or investigate these five witnesses, the result of the trial would have been different. See *Cheatham*, 296 Kan. at 431.

The most damning evidence against James presented at trial was testimony from L.B., the victim in this case. Relevant to the criminal charges lodged against James in this case, L.B. testified as follows:

- L.B. was born in September 1994.
- L.B. met James for the first time in early June 2010, when she was 15 years old.
- James was the drummer at the church she attended. One day at church in early June 2010, L.B. and James noticed each other through extended eye contact.
- In the days that followed, L.B. and James first began communicating by sending messages through Facebook and then spoke by telephone. In the first telephone call they had, James asked L.B. whether she wanted to go out on a date with him.
- In a later phone call, L.B. told James she was 15, and James told L.B. he was 24.
- In mid-June 2010—after L.B. told James she was 15—James and L.B. agreed that instead of going out on a date, James would meet L.B. at her house. James arrived between 10 and 11 that night. L.B.'s mom was at work and her stepfather and little sister were asleep in her mom's room. After a small conversation in the basement of L.B.'s house, James and L.B. engaged in vaginal sex. James left L.B.'s house between 12 a.m. and 1 a.m., right after the two were done having sex.
- The next night, James again went to L.B.'s house between 10 p.m. and 11 p.m. This time, L.B. took James to her bedroom, where James engaged in both oral sex and vaginal sex with L.B.

- After this second sexual encounter, James and L.B. talked about their relationship and decided they would become boyfriend and girlfriend.
- At some point during the summer of 2010—when L.B. was still 15 years old—L.B.'s younger half-sister, D.R., came to visit from Georgia. L.B. and D.R. stayed at their biological father's house together. Around midnight on one night during this stay, L.B. snuck out of the house and went with James to his parents' house, where they engaged in both oral and vaginal sex.
- Corroborating L.B.'s testimony, D.R. testified at trial that L.B. snuck out of their father's house around midnight one night to go have sex with James.

In addition to this testimony, L.B. testified about 21 electronic messages she received from James through Facebook when she was still 15 years old. The prosecutor asked L.B. to read each message out loud and then to provide the jury with her understanding of what the message meant:

- Exhibit 2, July 27, 2010, 5:55 p.m.
  Message: "Oh, okay. You're doing a good job. Just kinda scared me, but we cool, just take it easy with your mom. I-d-k [I don't know] why she tripping."
  Meaning: L.B.'s mom, who was in the church choir, had problems with James as the choir drummer. James was telling L.B. that she was doing a good job in her relationship with her mother.
- Exhibit 3, July 27, 2010, 6:22 p.m.
  Message: "You are perfect in my eyes, why would you think otherwise?"
  Meaning: When L.B. was 15, she had low self-esteem and did not think she was pretty. Although James told L.B. she was gorgeous and beautiful, she could not believe someone James' age would want to talk to her.

- Exhibit 4, August 18, 2010, 2:34 p.m.

  Message:  "You all on fb, I guess that means Facebook, saying—talking about you will tell them when the time is right."

  Meaning:  James was referring to the wall on L.B.'s Facebook page, where she had posted a status stating she was in a relationship and had made comments about the relationship. One of her Facebook friends asked who she was referencing and L.B. responded that she would tell her friends when the time was right.

- Exhibit 5, August 19, 2010, 2:58 p.m.

  Message:  "No. You don't need to share that with anybody."

  Meaning:  James was informing L.B. not to tell anybody about their relationship.

- Exhibit 6, August 20, 2010, 2:18 p.m.

  Message:  "'Cuz you need to think before you start saying stuff on your page like you sick and all that stuff. People not stupid. Oh, and you need to delete these messages."

  Meaning:  James was reiterating that L.B. should not tell anybody about their relationship and was instructing L.B. to delete all references to their relationship on her Facebook page because they needed to hide their relationship from everyone.

- Exhibit 7, August 21, 2010, 10:25 p.m.

  Message:  "I am at home. How you on Facebook, [L.B.]? Don't play with me, girl."

  Meaning:  Prior to this date, James and L.B. communicated through L.B.'s house phone or when L.B. was able to utilize someone else's computer. That night, L.B. accessed Facebook from home with a laptop the high school had just issued to her. James asked L.B. how she was able to access Facebook that night.

- Exhibit 8, August 21, 2010, 10:39 p.m.

  Message:  "I am, um, whose laptop you on and who's at your house?"

  Meaning:  As to the first half of the question, James wanted to know whose laptop L.B. was using. L.B. believed James probably was afraid she was using her

10

parents' laptop and would forget to exit out or delete evidence of their communication. As to the second half of the question, L.B. believed that based on the time stamp (10:39 p.m.), James wanted to come over to her house.

- Exhibit 9, August 21, 2010, 10:45 p.m.

  Message: "Oh, so you have nothing to say about that, huh? Cool. And I'm staying home, I'm too sore."

  Meaning: L.B. believed James thought she was taking too long to respond to his prior message about who was home at her house and so he indicated that he would just stay home.

- Exhibit 10, August 21, 2010, 10:57 p.m.

  Message: "Ha ha ha ha ha ha ha. Now, what sense does that make? He's not doing a good job of it and he need to be worrying about his wife and Brother [T.H.] He disrespected my brother and I don't appreciate that. My mom said she's gonna say something to him."

  Meaning: L.B. and James were discussing an incident between L.B.'s mother and stepfather. This discussion stemmed from a prior discussion in which L.B. told James that her mom suspected she and James were in a relationship and threatened to take L.B.'s laptop away.

- Exhibit 11, August 21, 2010, 11:02 p.m.

  Message: "Oh, it's going down, and he better not get out of line, 'cuz say he don't want to deal with—bunch of stars—Michael James, Senior—bunch of stars—no, sir. Trust me, and there is a Michael James, Junior and a Lamonte James. He wasn't right, point blank. Jesse is no animal, although he acts like one, in parentheses."

  Meaning: James was upset about what L.B.'s parents were going to do about their suspicion that he and L.B. were in a relationship and was also upset about what L.B.'s parents were saying about his brother Jesse, who meddled in things that were none of his business.

11

- Exhibit 12, August 23, 2010, 6:25 p.m.

  Message: "54 dollars is not much. I'll have it back on maybe Wednesday, but where the heck was you on Sunday?"

  Meaning: The comment about money had to do with the amount James needed to get his phone service turned back on. The comment about Sunday related to her absence from church.

- Exhibit 13, August 24, 2010, 2:23 a.m.

  Message: "It was off the chain. I been calling you, miss you, Boo."

  Meaning: James was telling L.B. that the church service went well and that he had been calling her because he missed her.

- Exhibit 14, August 24, 2010, 12:50 p.m.

  Message: "Was you sleep? I was blowing your phone up. Your dad picked up, l-o-l-o-l [laugh out loud]. He was like, who is this? And I was, like, Ernie. He was like, who? I repeated. I was like, dang, I didn't know Lisa was married, then I hung up. Funny, l-o-l."

  Meaning: James would call L.B. on the house phone because L.B. did not have a cell phone. That night James called the house phone and L.B.'s stepfather answered the call. James tried to play it off as a wrong number.

- Exhibit 15, August 24, 2010, 11:11 p.m.

  Message: "Can't wait to see you, too."

  Meaning: James was going to come over to L.B.'s house that night.

- Exhibit 16, August 27, 2010, 11:19 a.m.

  Message: "L-o-l, wow, high school. Been there, done that. Next hour, l-o-l-o-l. I'm about to go to the barber shop."

  Meaning: James was asking L.B. what she was doing and after L.B. told him she was getting ready to go to her next class at school, James responded he had been there and done that.

- Exhibit 17, August 27, 2010, 11:42 a.m.

  Message: "L-o-l, laugh out loud, you funny. We'll see what happens and what you got to ask me. But yeah, just call that number, [seven-digit number provided]."

  Meaning: James' phone was turned off so he told L.B. to contact him through a different phone number.

- Exhibit 18, August 27, 2010, 11:48 a.m.

  Message: "Ah, I really do. Miss you a lot. You're that voice I need to hear before I go to bed, but yeah, hit me up after school. Oh, and by the way, my phone—by that time my phone will be on, so call my cell instead, [seven-digit number provided]."

  Meaning: James told L.B. his phone was back on so L.B. should call his number instead of one of the alternative phone numbers.

- Exhibit 19, August 31, 2010, 12:47 p.m.

  Message: "Yes. Waiting on you. Never again. You don't love me."

  Meaning: That night James was scheduled to go to L.B.'s house but she never let him in because she was waiting for her stepfather to go to sleep.

- Exhibit 20, September 1, 2010, 9:13 p.m.

  Message: "I-d-k, I don't know if you ever care about me like that. I mean honestly, come on now. You don't ever call no more or invite me over no more."

  Meaning: Around this time period, L.B. and James were arguing about each other's prior relationships. L.B. was upset because she believed James was lying about what currently was going on between James and his prior girlfriend; so, L.B. stopped calling James and stopped inviting James to come to her house.

- Exhibit 21, September 1, 2010, 9:27 p.m.

  Message: "Miss you, too, baby, doubt you do."

  Meaning: Although L.B. stopped calling James and stopped inviting him over, L.B. told James that she missed him; but, James did not believe her.

13

Based on L.B.'s testimony, D.R.'s testimony, and the electronic messages sent from James to L.B. as set forth above, we are not persuaded there existed a reasonable probability that, but for the attorneys' failure to follow-up on, investigate, or use at trial the five witnesses identified by James, the result of the trial would have been different. We note, as a preliminary matter, that James did not call any of these five witnesses to testify at the posttrial hearing; instead, James testified to what he believed each of the five witnesses would say. First, James said Jesse would have testified that he used James' Facebook account to send 12 of the 21 electronic messages set forth above. But James also conceded at the hearing that *he* sent 11 of the 21 electronic messages to L.B. Based on L.B.'s testimony at trial, the 11 messages James admits he wrote included communications in which James admonished L.B. for status posts on L.B.'s Facebook page related to L.B. and James' relationship, instructed L.B. to continue to keep the relationship a secret, told L.B. that he could not wait to see her that night, and directed L.B. to contact him at an alternative number because his phone service had been turned off. And, although James conceded that he wrote an electronic message sent on August 27, 2010, at 11:42 a.m. telling L.B. to call him at a different number, James denied he wrote an electronic message sent 6 minutes later telling L.B. that his cell phone service should be turned back on by that evening.

Next, James said Hussie and S.H. would have testified that they were part of a three-way phone conversation during which L.B. admitted that she had a sexual relationship with James *after* she turned 16. But even if this were true, this testimony would not have furthered the theory of the defense in this case: that L.B. did not engage in a sexual relationship with James *before* she turned 16. In fact, at one point during his testimony, James said S.H. told Hussie that James and L.B. *were* in a sexual relationship before L.B. turned 16. The proposed testimony from these two witnesses would have been entirely consistent with L.B.'s testimony at trial that her sexual relationship with James spanned a 2 1/2-year period that started when she was 15 and ended when she was 17. Finally, James said his mother and his sister could testify that James and L.B. never

14

had sex at James' house. But on cross-examination, James conceded that his mother and his sister did not monitor him in the house 24 hours a day, 7 days a week.

Considering the sum total of the evidence presented at trial, there simply is not a reasonable probability that the presumed failure of James' attorneys to follow-up, investigate, or call at trial the witnesses identified by James would have altered the results of James' trial.

   b. *Failing to introduce evidence at trial*

James testified that he provided to his attorneys recordings of phone conversations and voicemails as well as e-mails and a letter written by L.B., but his attorneys declined to use any of this evidence at trial. James argues his attorneys' decision in this regard constitutes deficient performance that deprived him of a fair trial. For the reasons stated below, we disagree.

James testified he provided his attorneys with recordings of conversations in three separate phone calls that took place after L.B. turned 16. James said the first recorded conversation was between James and Mother. James never testified regarding the subject matter discussed in the recorded phone call. James testified that the second recorded conversation was between James and L.B. in which L.B. acknowledged that she and James "had a relationship after she was 16." James said the third recorded conversation was a three-way phone call in which L.B. said she thought James was "really cute." Next, James testified he provided to his attorneys a recording of two voicemails left for him after L.B. turned 16. James testified that in the first voicemail, L.B.'s stepfather threatened to kill him. James testified that in the second voicemail, L.B. urged James to pick up the phone because L.B. was going to have an abortion, and she did not know what to do. Next, James testified he provided his attorneys with an e-mail written by L.B. and sent to James' former girlfriend, who was the mother of James' child, as well an e-

15

mail written by L.B. in which she acknowledged she had a relationship with James after she turned 16. Finally, James provided his attorneys with a handwritten but undated letter from L.B.

With regard to some of the documentary evidence James said he provided to them, James' trial attorneys explained the underlying strategy for the decision not to use such evidence at trial. With regard to the balance of the documentary evidence James said he provided to them, James' trial attorneys testified they could not remember reviewing the evidence. As stated above, however, a defendant has the burden to establish that the deficiencies alleged were not the result of strategy. *Adams*, 292 Kan. at 168. Because James concedes Alexander and Seiden were fully informed about the contents of the recordings and the written communication but decided not to use it, James bore the burden to establish the decision to forgo using it was not trial strategy. In an attempt to do so, James claims all of the documentary evidence he provided to his attorneys was recorded or sent after L.B. turned 16 and, therefore, tends to establish that he and L.B. engaged in a sexual relationship after L.B. turned 16. But his argument is flawed. Although the documentary evidence at issue may have been relevant to establish that James and L.B. engaged in a sexual relationship after L.B. turned 16, James has failed to establish that this evidence was relevant to the actual charges lodged against him: that he and L.B. engaged in a sexual relationship with James *before* she turned 16. In sum, James has failed to argue, let alone provide facts to establish, that his attorneys' decision not to use the documentary evidence was anything but trial strategy.

c. *Advising James not to testify*

Next, James argues that his attorneys performed deficiently by advising him not to testify. He actually makes two specific arguments. First, he argues that the attorneys denied him his right to testify by coercing him into deciding not to testify. Second, James argues that advising him not to testify was objectively unreasonable.

First, the record does not support James' argument that it was objectively unreasonable to advise him not to testify. Alexander testified that he was worried James would appear "a bit slick" on the witness stand. He later stated that when James spoke about his relationship to L.B., he was "quite flippant," and Alexander was worried that he would not appear sincere to the jury. These appear to be reasonable strategic concerns for a defense attorney.

But more importantly, James' own testimony refutes his claim that he was coerced into not taking the stand. When questioned by his own counsel, he said he felt he could have testified if he wanted to. Additionally, at trial, the district court judge explained to James that he alone controlled whether he was going to testify. Afterwards, James told the judge that he had consulted with his attorneys and decided not to testify. For these reasons, James has failed to establish that his attorneys were ineffective for advising him not to testify.

d. *Failing to secure an unbiased jury*

James argues that his attorneys provided ineffective assistance of counsel in failing to secure an unbiased jury. First, he argues that his attorneys performed deficiently by allowing a juror who worked in the district attorney's office to serve on the jury panel. Second, he argues that his attorneys were ineffective for failing to pursue a mistrial based on the fact that one prospective juror failed to return from a break during voir dire.

As to the juror from the district attorney's office, the district court found the attorneys had discussed the issue together and with James. The court also noted that both Alexander and Seiden had frequent contact with the juror due to their jobs and thus had a rationale for keeping her on the jury. Furthermore, James admits in his brief that the juror said she would not be biased because of her employment.

17

Despite the juror's statement to the contrary, James argues that the juror necessarily was biased due to her employment. But James cites no authority to support his argument that an employee of a district attorney's office is automatically unqualified to serve on a criminal jury. Further, an appellate court must strongly presume that an attorney's conduct fell within the broad range of reasonable professional assistance. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009). Alexander testified that he believed the juror would be favorable to James' defense based on the fact that he represented the juror's mother in another case and that he was well-acquainted with the juror. Coupled with the juror's assurances that she would not be biased, these facts constitute substantial competent evidence supporting the district court's conclusion that Alexander's and Seiden's performances were not deficient in failing to strike the juror.

As to the juror who left during voir dire, James argues his attorneys unreasonably failed to object to the juror's absence and therefore performed deficiently. But his argument in this regard only consists of two sentences. James does not cite any authority supporting his assertion that Alexander and Seiden acted unreasonably, nor does he attempt to explain his argument. "A failure to support an argument with pertinent authority or to show why the argument is sound despite a lack of authority or in the face of contrary authority is akin to failing to brief the issue." *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013). An issue not briefed is deemed waived and abandoned. *State v. Jones*, 300 Kan. 630, 639, 333 P.3d 886 (2014). Therefore, James waived and abandoned this argument.

e. *Failing to request a preliminary hearing*

Finally, James argues that Alexander and Seiden were ineffective for failing to ask the district court to hold a preliminary hearing. The attorney who initially represented James waived a preliminary hearing, and the record is silent as to why he chose to do so.

18

James claims that Alexander and Seiden were ineffective for failing to pursue a preliminary hearing after they began representing James.

The purpose of a preliminary hearing is "to determine that a crime has been committed and to give the defendant general information of its nature and inform him [or her] of the nature of the evidence he [or she] will be required to meet when placed on trial in the district court." *State v. Robertson*, 190 Kan. 771, 774, 378 P.2d 37 (1963). The State points out that after a conviction, "any error at the preliminary hearing stage is considered harmless unless it appears that the error caused prejudice at trial." *State v. Jones*, 290 Kan. 373, 381, 228 P.3d 394 (2010). James argues on appeal that he was prejudiced by his attorneys' failure to secure him a preliminary hearing because he was surprised by the evidence at trial.

James does not explain, however, what evidence was surprising. On the other hand, his testimony concerning the witnesses he would have liked to have called at trial establishes that he was aware of the general allegations against him. Furthermore, Alexander received 150 pages of discovery shortly after he entered his appearance in the case. In short, James failed to establish that it was objectively unreasonable to fail to pursue a preliminary hearing, especially since James had previously waived such a hearing when represented by a different attorney.

But even if Alexander and Seiden did perform deficiently, James failed to establish the necessary prejudice. The district court stated that it rarely reopened preliminary hearings so close to trial and that it did not feel it would have been willing to do so in this case. To that end, there is nothing in the record that indicates that if a preliminary hearing had been held in this case the results of the trial would have been different.

## 2. *Evidence of a witness' alleged extramarital affair*

In his second claim of error regarding the district court's decision to deny his motion for a new trial, James challenges the decision of the district court to exclude evidence that Mother was having an extramarital affair. James wanted to introduce this evidence in an attempt to show that Mother reported James' crimes to the police because she was angry that James knew about her affair.

First, a review of some additional facts is necessary. At trial, Alexander cross-examined L.B. about one of the Facebook messages she received. The message was received by L.B. on August 21, 2010. This message stated, in part, that L.B.'s stepfather needed to be worrying about Mother and T.H. T.H. was an employee of L.B.'s church. When Alexander began to question L.B. about what the message meant, the State objected based on relevance.

During a bench conference on the objection, Alexander explained that he was trying to establish Mother's motivation for reporting the sexual contact between James and L.B. Alexander asserted Mother had "an axe to grind" with James and, for that reason, she reported him to the police. The district court found that any evidence relating to Mother's alleged affair was irrelevant to this case. At the hearing on the motion for a new trial, the same district court judge who presided over the trial reiterated that he did not believe the evidence relating to the affair was relevant to a motive or any other dispute in the case. The district court judge said he believed it was an attempt to slander members of the victim's family who were not on trial. On appeal, James argues the district court's decision to exclude evidence of Mother's alleged extramarital affair deprived him of his right to present a full and complete defense.

Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as "evidence having any tendency in reason to prove any material

fact." K.S.A. 60-401(b). "This definition incorporates two requirements—the evidence must be both material and probative. [Citations omitted.] Evidence is material when the fact it supports is in dispute or an issue in the case and is probative when it has a logical tendency to prove a material fact. [Citations omitted]." *State v. Huddleston*, 298 Kan. 941, 959, 318 P.3d 140 (2014). This court reviews materiality de novo and the district court's assessment of probative value under an abuse of discretion standard. 298 Kan. at 959-60.

In support of his argument that the district court's decision deprived him of the right to present his defense, James asserts evidence of the alleged affair casts doubt on whether L.B. was actually 15 at the time of the sexual acts with James. James argues Mother was motived by anger and a desire to hurt James when she reported him to the police. But Mother's motivation for making the initial report has no bearing on whether a crime was actually committed; accordingly, the evidence was not material in the case. And even if evidence of the alleged extramarital affair was material, the district court did not abuse its discretion in excluding it because the fact that Mother may have had an extramarital affair had no tendency to prove whether James victimized L.B.

3. *Cumulative error*

"Cumulative trial errors, considered collectively, may be so great as to require reversal of a defendant's conviction." *State v. Pruitt*, 42 Kan. App. 2d 166, Syl. ¶ 9, 211 P.3d 166 (2009). James argues that cumulative errors deprived him of a fair trial in this case. Based on the analysis set forth above, however, we are not persuaded by James' assertions that trial counsel was ineffective or that the district court erroneously excluded relevant evidence. Given we have found no error at all, James' claim of cumulative error is without merit.

Affirmed.