No. 69,344

STATE OF KANSAS, *Appellee*, v. DONALD E. BRUCE, *Appellant*.
(874 P.2d 1165)

Opinion
filed May 27, 1994.

*Wendy L. Rhyne Slayton*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Frank D. Diehl,* assistant district attorney, argued the cause, and *Christine E. Kenney,* assistant district attorney, *Gerald E. Wells,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Donald E. Bruce, who was convicted by a jury of one count of child abuse (K.S.A. 21-3609) and one count of felony murder (K.S.A. 1992 Supp. 21-3401). He received sentences of 3 to 10 years for child abuse and life imprisonment for felony murder. The sentences were ordered to run concurrently. The trial court denied the defendant's motion for modification.

The defendant raises three issues on appeal. He contends the trial court committed reversible error in failing to instruct the jury on voluntary intoxication and in responding to a request by the jury. He also alleges the trial court abused its discretion in failing to consider probation as an option when denying a modification motion.

The victim in this case was 23-month-old Eric Brewer. Eric was 34 inches tall and weighed approximately 28 pounds. The autopsy revealed 57 separate bruises on the trunk of his body, the most severe of which were on his chest where there were at least 27 separate bruises. There were 104 separate bruises on his legs, arms, hands, back, and buttocks.

The pathologist's internal examination of Eric revealed extensive injuries. There was hemorrhaging in the chest area and around the pericardial sac surrounding the heart, as well as small hemorrhages scattered over the surface of the heart. There was also hemorrhaging over the surfaces of the lungs and into the diaphragm muscles, consistent with the result of very severe blows to the chest area. Eric's liver was essentially torn in half, and there was extensive hemorrhaging into his stomach and abdominal cavity. Eric's pancreas was torn and fragmented. There were also injuries and hemorrhaging around the tissues surrounding the kidneys and adrenal glands.

The pathologist was of the opinion that Eric died as a result of severe internal injuries to the liver and pancreas. This type of injury could have resulted from someone placing their knees on

the abdomen and chest and coming down with some force or from a severe kick. The pathologist testified, "The type of force it would take to split the liver in half, and disrupt the head of the pancreas to this extent is really very, very great. I have seen injuries such as this in accidental injuries where children were passed over by the wheel of a car."

Eric's parents, Wendy Brewer and Scott Brewer, were separated. Wendy was engaged to the defendant. On February 4, 1992, the night before Eric's death, Scott Brewer was with Eric until approximately 12:00 or 12:30 a.m. when Wendy and the defendant (along with Wendy's father) picked up Eric. The defendant testified that prior to picking Eric up and over a period of at least four hours, he consumed three or four bottles of beer and six to nine mixed drinks. Wendy's father took her, Eric, and the defendant to the mobile home of Bronica and Robert Aden. Bronica Aden is the defendant's half-sister and Wendy's stepsister.

The defendant testified at trial and also gave the police two handwritten, signed statements. The first was given at 3:32 p.m. on February 5, 1992. It was admitted into evidence at trial and read into the record. It reads as follows:

"On Tuesday night about 1:00 a.m. I put Eric on my lap and held his head in my hand's and rocked him from side to side fast and did this for about 5 maybe 10 mins. Then I took his arms and was rolling them around causing them to hit his face and arms they his arms & face did get red. Eric then started to cry and I got him by his shirt and picked him up and told him to quit crying or I would give him something to cry for and spanked his bottom 3 times pretty hard and put him to bed. He was crying then and I told him to shut-up and he did! He (Eric) then started crying again so I returned to the bedroom and saw he had gotten sick so I cleaned him up and no matter how much I tryed he wouldn't stop crying so I picked him up and shook him hard one time. He then stopped breathing, and I got scared and put him on the bed and hit and pushed his chest to make him breath again and at the time it worked. But he still didn't sound right! So I hit him on his back thinking that would help. It also worked then I left. At 2:10 a.m. Wendy and I left and walked to my brothers house got a car and went to a gas station got smoke's & a pop and returned to 1045 W 23rd Lot 8 and I looked in on Eric then. I feel my drinking and all the pressure from family and from Scott and the fact that I didn't know how to get Eric to stop crying I lost my temper and not meaning to hurt Eric God know's I never wanted to hurt him I just lost my cool!"

The second statement, also handwritten by the defendant, was given at 5:06 p.m. on February 6, 1992. It, too, was admitted into evidence at trial and read into the record. It reads:

"Eric and I were in the living room playing in the chair and I was playing rough with him like always. I had his head in my hand's and was rocking from side to side kind of fast. Then I took his arm's in my hands and was slap boxing with him and causing Eric's hands to hit his face and arm's. I then let him down he gave Wendy a kiss and was crying I picked him up in my right hand and put him on my shoulder and told him to stop crying or I would give him something to cry about. Then I spanked him and took him to bed, where he got sick. I took his shirt of and cleaned him up useing a sheet. He was still crying so I shook him at that point he stopped breathing and I got scared and hit him on his chest 4 or 5 times hard and that seem to help but not really so I put him on my lap and hit him on the back twice hard with my hand open. That seem to allow him to breath but he was still crying when I put him down. So I put the cover over him and put my left knee on his stomach and my right knee on his chest and pushed twice. My knee in his stomach gave both times. Eric then did stop crying but was whezzing. I then left the room and went out and left with Wendy at 2:10 a.m. to walk to my brother's and get my sisters car. Got back at 4:00 a.m. and went back to the living room. I had to much to drink and didn't realize I was playing with Eric so rough and I never meant to hurt or kill him! I had gotten upset because Eric was still crying and that's why I put my knee's on him only to make his stop crying! Nothing else but that!"

Relatives of Bronica and the defendant, including their mother, sister, and two brothers, testified that Bronica told them she had awakened at approximately 3:00 a.m. to use the bathroom and she saw her husband, Robert Aden, playing with Eric at that time. This was while Wendy and the defendant were away from the trailer. One witness testified that Bronica told him Robert had gone back to Eric's room three or four times and was pacing, and Eric stopped crying the third time. Bronica's and the defendant's sister and mother both testified that Bronica told them she felt that Robert, not the defendant, had killed Eric. At trial, Bronica denied having awakened while Wendy and the defendant were absent from the trailer.

Other witnesses included Detective Davis, who had questioned the defendant after Eric's death and who had witnessed the written statements given by the defendant. One of the main differences between the information the defendant gave to Detective

Davis and the defendant's testimony in court is that Detective Davis testified that at one point the defendant told him when he returned to the trailer with Wendy at approximately 4:00 a.m. and checked on Eric, Eric was not breathing. Detective Davis testified that the defendant told him he attempted to resuscitate Eric by pushing on Eric's chest and blowing into Eric's mouth. Eric's body was cold and his lips were purple. The defendant put Eric back into his sleeping bag and did not tell anyone what had happened. However, the defendant had also told Detective Davis that Eric was fine when he checked on him. Concerning the defendant's statement about putting his knees on Eric's chest and stomach, Detective Davis testified that the defendant told him at first that he went down hard but then that it was a medium amount of pressure.

## I. VOLUNTARY INTOXICATION

Voluntary intoxication may be a defense to a crime requiring a specific intent. *State v. Sterling*, 235 Kan. 526, Syl. ¶ 2, 680 P.2d 301 (1984). The defendant recognizes that this court in *State v. Hupp*, 248 Kan. 644, 652-53, 809 P.2d 1207 (1991), held that the words "cruelly beating or inflicting cruel and inhuman corporal punishment" do not require a specific intent to injure. However, he observes that the crime of child abuse (K.S.A. 21-3609) also includes the phrase "willfully torturing," which he contends does require specific intent, and he contends that because the case went to the jury on all three theories of child abuse, the jury should have been instructed on voluntary intoxication as a defense to child abuse by means of willful torture.

In *Hupp*, an infant died as a result of a blow to the head which crushed his skull. Although not in the context of a voluntary intoxication defense, this court stated that "[a]n intent to injure is not implicit in 'cruelly beating or inflicting cruel and inhuman corporal punishment.' It is the act of hitting and hurting that is made a crime." 248 Kan. at 653. The issue there was whether the trial court erred in failing to instruct the jury on lesser included offenses. This court held there was no error in failing to instruct the jury on the lesser included offenses of involuntary

manslaughter and battery. The facts showed that the child died as a result of a single blow to the head, and this court stated that "[a] blow that crushes an infant's skull and kills the child is, as a matter of law, a 'cruel beating.' " 248 Kan. at 653. Because an intent to injure is not implicit in "cruelly beating or inflicting cruel and inhuman corporal punishment," there was no error in failing to instruct on the lesser included offense of involuntary manslaughter. The defendant had either hit the child and crushed his skull, or he had not done so; if the defendant had done so, "then the proper charge is felony murder by child abuse." 248 Kan. at 653.

Here, defense counsel requested the court to instruct the jury on the defense of voluntary intoxication. He did not specify on the record for which offenses he sought to have the instruction given. The court agreed to give an instruction on voluntary intoxication as a defense to the lesser included offenses of second-degree murder and voluntary manslaughter. Defense counsel made no request on the record that the instruction be extended to the offenses of child abuse and felony murder by means of willful torture, nor did he object to the instruction as given. The jury was instructed as follows:

Instruction No. 14:

"Voluntary intoxication may be a defense to murder in the second degree or voluntary manslaughter, where the evidence indicates that such intoxication impaired defendant's mental faculties to the extent that he was incapable of forming the necessary intent of intentionally killing Eric Brewer."

Instruction No. 15:

"The defendant is charged with the crime of abuse of a child. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant willfully tortured, cruelly beat, or inflicted cruel and inhuman bodily punishment upon a child, Eric Brewer, who was under the age of eighteen years;
2. That this act occurred on or about the 5th day of February, 1992, in Douglas County, Kansas.

"Willfully:

"Willfully means conduct that is purposeful and intentional and not accidental.

"The words 'cruelly beating or inflicting cruel and inhuman corporal punishment' do not require an intent to injure. It is the act of hitting and hurting that is made a crime."

Where a crime requires a specific intent, an instruction on voluntary intoxication as a defense to the crime may be appropriate. K.S.A. 21-3208(2); *State v. Sterling*, 235 Kan. 526, Syl. ¶ 2. "The distinction between a general intent crime and a crime of specific intent is whether, in addition to the intent required by K.S.A. 21-3201, the statute defining the crime in question identifies or requires a further particular intent which must accompany the prohibited acts." 235 Kan. 526, Syl. ¶ 1. In *Sterling*, this court held that criminal damage to property under the theory of willfully damaging or injuring property under K.S.A. 21-3720(1)(a) did not require specific intent such that an instruction on the voluntary intoxication defense was required, but this court recognized that voluntary intoxication may be a defense to criminal damage to property under K.S.A. 21-3720(1)(b), which required injuring or damaging property "with intent to injure or defraud an insurer or lienholder." 235 Kan. at 530. Hence, the question here is whether "willfully torturing" requires a specific intent to injure in addition to the general intent required.

The defendant contends that the term torture requires a specific intent to inflict pain or to injure. He points to the dictionary definition of "torture," which indicates that torture is the infliction of pain as a means of punishment or coercion. "Torture" means "[t]o inflict intense pain to body or mind for purposes of punishment." Black's Law Dictionary 1490 (6th ed. 1990). The defendant relies primarily on *People v. Martinez*, 193 Cal. App. 3d 364, 238 Cal. Rptr. 265 (1987). *Martinez* involved the offense of murder by torture rather than child abuse by torture. In *Martinez*, the court stated, "Murder by torture is murder committed with a willful, deliberate and premeditated intent to inflict extreme and prolonged pain." *Martinez*, 193 Cal. App. 3d at 373.

A specific intent to injure is not implicit in the phrase "willfully torturing." This court has held that an intent to injure is not implicit in the phrase "inflicting cruel and inhuman corporal punishment." *Hupp*, 248 Kan. at 653. Thus, even if "torture" must

be for the purpose of punishment, as the defendant argues, *Hupp* indicates that there is no specific intent to injure required in the term "punishment." As the State argues, "[t]he word torture does not raise abuse of a child to the level of a specific intent crime any more than the words 'inflicting cruel and inhuman corporal punishment.' " The trial court did not err in failing to give a voluntary intoxication instruction.

## II. RESPONSE TO JURY

During deliberations, the jury presented the following written question:

"CAN WE ASK FOR WRITTEN COPIES OF COURT TESTIMONY?

> /s/ Jon W. Dunbar
> presiding juror

.WE ARE INTERESTED IN
BOTH ADENS
DR. SPERRY
DET. DAVIS
DONNY BRUCE."

To put this in perspective, the testimony of these witnesses spanned 444 pages of the 765-page trial transcript. The trial took four days, so a read-back of that part of the transcript would be of testimony which took the better part of two days to present.

The trial judge and counsel for the defendant and the State discussed the appropriate response to the jury's question as follows:

"THE COURT: . . . The second question just came in. 'Can we ask for written copies of court testimony[?]' Signed presiding juror. 'We are interested in both Adens, Dr. Sperry, Detective Davis, and Donnie Bruce.'

"MS. KENNEY [counsel for the State]: Both Adens?

"THE COURT: They're interested in most of the trial is what they're saying. Mr. Wells?

"MR. WELLS [counsel for the State]: Well, I think, normally the Court says, 'Rely upon your memory.' I thinks that's—if they want a read back, that's one thing.

"THE COURT: They are not entitled to written copies. I'm not sure written copies could be furnished even if they were entitled to it. If a certain court reporter gets their way, they might some day. Melanie, she's volunteered to do— what's it called?

"THE REPORTER: Real time translation.

"MR. WARREN [counsel for the defendant]: The last time I had this question asked was a trial I had in front of Judge Paddock, and just as a suggestion as a way, at least the way the judge handled it is he let them know that there just wasn't any way to do it, for one thing, and maybe if they realize, that they'll get off that particular mental position that they would like to have it.

"MR. WELLS: Sounds all right.

"THE COURT: My suggested answer would be there is no possible way that the transcripts could be prepared in this short of time for your review. Is that agreeable?

"MR. WARREN: If you wanted to perhaps add, 'You should rely on your collective memories,' or something.

"MR. WELLS: That's fine.

"THE COURT: The suggested answer to this has been to the question, 'Can we ask for written copies of court testimony?' Answer, 'It is not possible to have written transcripts prepared for your review. Please rely on your collective memories.'

Mr. Wells?

"MR. WELLS: Yes.

"MR. WARREN: Absolutely."

The written response was: "It is not possible to have written transcripts prepared for your review @ this time. Please rely on your collective memory in recalling the testimony. /s/ Michael J. Malone."

The defendant contends this response was unresponsive and misleading. He suggests that what the jury really was asking for was not written copies of testimony, but rather a read-back of testimony. The defendant notes that the district court has discretion in fashioning responses to a jury's questions, but he argues that discretion does not involve giving misleading or unresponsive answers. Moreover, the defendant suggests that the trial court has a duty under K.S.A. 22-3420(3) and related case law to read testimony back to the jury upon its request for a read-back.

Since oral argument in the case at bar, this court has filed a decision that is instructive in this area. In *State v. Myers*, 255 Kan. 3, 872 P.2d 236 (1994), we held that a trial judge has a duty to clarify whether a jury wants a transcript of testimony or merely wants a read-back and, if a read-back is desired, to determine to what extent the read-back is necessary. We also held that the mandatory directive in K.S.A. 22-3420(3) moves the trial court

response out of the realm of discretion and that a defendant need not show prejudice. We further said that "[t]he trial court is free to clarify the jury's read-back request where the read-back request is unclear or too broad, or the read-back would jeopardize the manageability of the trial. Discretion rests with the trial court to clarify and focus the jury's inquiry." 255 Kan. 3, Syl. ¶ 2.

We also have another rule which controls this case. A litigant "may not invite and lead a trial court into error and then complain of the trial court's action on appeal." *State v. Prouse*, 244 Kan. 292, 298-99, 767 P.2d 1308 (1989). "A defendant is not permitted to join in a request for specific language to be used in answering a jury's question and then, on appeal, claim that the trial court erred in using that language." *State v. Cramer*, 17 Kan. App. 2d 623, Syl ¶ 2, 841 P.2d 1111 (1992), *rev. denied* 252 Kan. 1093 (1993). See *State v. Salton*, 238 Kan. 835, 837, 715 P.2d 412 (1986); *State v. Falke*, 237 Kan. 668, 682, 703 P.2d 1362 (1985).

In *State v. Cramer*, 17 Kan. App. 2d 623, counsel for the defendant participated in choosing the specific language used in responding to a question by the jury and did not object to it. The trial court specifically found that both parties desired that the instruction be given. The Court of Appeals, following our Supreme Court decisions, stated:

"After participating in the drafting of the answer to the jury's question, defendant now argues that the trial court erred in giving that answer and asks that we reverse the conviction as a result.

"The record shows that the answer given by the trial court which defendant now claims is error was given at the joint request of the State and defendant. After the prosecuting attorney suggested the language used, defense counsel responded by saying: 'I really don't have a problem with setting out the standard that's in the syllabus that Mr. Pierce suggested.' We could not have a more clear-cut case of acquiescence in the giving of the answer. Indeed, defense counsel joined the State in requesting that the answer be given as suggested by the prosecuting attorney. Defendant should not be permitted to join in a request for specific language to be used in answering the jury's question and then on appeal claim that the court erred in using that language.

"If the language used to answer the jury's question was erroneous, then it was error invited by defendant. 'A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal.' *State v. Prouse*, 244 Kan. 292, 298-99, 767 P.2d 1308 (1989)." 17 Kan. App. 2d at 632.

Having invited the error and participated in it, the defendant cannot now claim error.

## III. MOTION TO MODIFY SENTENCE

The defendant filed a motion to modify sentence which was heard after the Topeka Correctional Facility (TCF) report was completed. That report recommended that the defendant serve the appropriate sentence and commented: "In light of the nature of the instant offense, there is clearly no option for this inmate other than serving an appropriate sentence." In denying the motion to modify, the court stated:

"Life is the only sentence I had in an A felony. Three to ten, I gave that sentence, I believe, because it was a concurrent act, so to speak, that of abuse of a child. I ordered they run concurrent, and certainly would not consider giving the gentleman probation. It wasn't that favorable a report, and nevertheless, I would never consider that anyway."

The defendant's controlling term of incarceration here is life imprisonment. This is the mandatory term upon conviction of a class A felony. K.S.A. 21-4501(a). Sentencing options are available, however, including suspending imposition of the defendant's sentence or assigning the defendant to a community correctional services program. K.S.A. 1992 Supp. 21-4603(4) and (5). Probation is an available sentence alternative when a defendant has been convicted of a class A felony, as the defendant was here. See *State v. Lumbrera*, 252 Kan. 54, 74, 845 P.2d 609 (1992).

K.S.A. 1992 Supp. 21-4603(4) requires a district court to modify a defendant's sentence upon an unequivocal recommendation by TCF, unless the court makes certain findings on the record. See *State v. Boomgaarn*, 249 Kan. 673, 822 P.2d 605 (1991); *State v. Moon*, 15 Kan. App. 2d 4, 801 P.2d 59 (1990), *rev. denied* 248 Kan. 998 (1991). "Absent an unequivocal recommendation for modification by the [TCF], the court has discretion in modifying sentence and commits no error in refusing modification of sentence absent an abuse of that discretion." *Moon*, 15 Kan. App. 2d at 10.

There was no unequivocal recommendation for modification here. The defendant recognizes that the court has discretion in

ruling on his motion to modify. He contends, however, that the comments of the court show that the court did not use its discretion in denying his motion for modification.

The defendant relies on *State v. Fisher*, 249 Kan. 649, 822 P.2d 602 (1991). There, the defendant pleaded guilty to possession of marijuana and possession of cocaine. After sentencing the defendant, the district court stated, " 'This Court does not grant parole on convictions of cocaine, first offense or any other.' " 249 Kan. at 652. This court concluded that the district court's comment referred to probation and not to parole and stated:

"The district court's comment can certainly be interpreted to mean the conviction of a cocaine offense means an automatic sentence of imprisonment regardless of any other factors present. Thus, the district court did not use discretion in denying the requested probation, as probation could never be considered as an option to imprisonment. This is contrary to the policy set forth in K.S.A. 21-4601." 249 Kan. at 652.

The defendant's reliance on *Fisher* is misplaced. The district court's comments here in denying the motion to modify cannot be said to reflect a complete failure to exercise discretion or to follow the policy set forth in K.S.A. 21-4601. In *Fisher*, the critical comment by the court showed that the court would in no instance consider probation for cocaine convictions. Here, however, the court made no such comment. The judge stated that he "would not consider giving *the gentleman* probation," and he noted that the TCF evaluation was not favorable. (Emphasis added.) This reflects that the court did consider the individual circumstances of this defendant in denying modification. The court did comment, "nevertheless, I would never consider that anyway," after noting that the TCF report was not favorable, but this comment was made in the context of relating the denial of modification to this particular defendant and to the facts of this case and in the context of indicating that even had the TCF report been favorable, modification would not have been granted. Judge Malone had heard the evidence presented at trial, he had read the presentence investigation report before sentencing the defendant and addressing the factors mandated by K.S.A. 21-4601 and K.S.A. 21-4606 at the time of sentencing, and he had read the TCF

report before denying modification. When read in the context of the entirety of the court's comments, the defendant has not shown that the court exercised no discretion or that the court abused its discretion in denying modification here.

Affirmed.