NOT DESIGNATED FOR PUBLICATION

No. 118,205

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CATRIECE LANAE MONTGOMERY,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed March 22, 2019. Affirmed in part, vacated in part, and remanded in part with directions.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Rachel L. Pickering*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., POWELL, J., and STUTZMAN, S.J.

PER CURIAM: A Shawnee County jury convicted Catriece Montgomery of aggravated robbery arising from events in the early morning hours of June 27, 2015. The State argued Montgomery's culpability under an aiding and abetting theory. Montgomery appeals her conviction, asserting seven categories of alleged error, including the district court's order for her reimbursement of expenses to the Board of Indigents' Defense Services (BIDS). Since we find no error in her trial, we affirm her conviction. We find, however, that in determining Montgomery's repayment of expenditures to BIDS, the district court failed to follow the directions set out in *State v. Robinson*, 281 Kan. 538,

1

132 P.3d 934 (2006), and we vacate the BIDS order and remand to the district court for further proceedings on that issue alone.

## FACTS AND PROCEDURAL BACKGROUND

LaMonica Steele and her boyfriend stayed at the Plaza Inn Hotel in Topeka on June 26, 2015, for "a night off" from watching Steele's children. Shortly before 2 a.m. on June 27, Steele left the hotel, walking, to visit her sister. When she left, a maroon colored four-door sedan was parked in the hotel parking lot with a man and two women standing near the vehicle, engaged in an argument. The man, wearing a red shirt, stood between the car and an open passenger door. Two women stood toward the back of the car. One of the women wore a black and white dress and the other wore a black shirt with blue jeans. The male was later identified as Kendall Childress, the woman in the dress was Catriece Montgomery, and the woman wearing jeans was Shabre McCray. Steele overheard Childress yelling at the women about his glasses as he waved a gun in the air.

Steele came to the end of the sidewalk, stepped into the parking lot, and said "excuse me" as she approached the group, intending to walk around the back of the maroon car so she could approach her own vehicle without walking in the grass. Steele passed Childress, but when she tried to walk past Montgomery, Montgomery said, "Bitch, I don't like you, either" and hit Steele in the face. Steele lost her balance but replied, "You don't know me." Montgomery began hitting Steele, who fell to the ground, curled into a fetal position, and placed her arms in front of her face.

When she left the hotel, Steele had a tan purse, a blue iPhone 5G with a cracked screen, and her keys on a white lanyard with "Come at me, bro" printed on it. During Montgomery's attack, McCray took these items from Steele and put them in the maroon car. Steele testified neither Montgomery nor McCray had "any right, license or authority to take any of [the] personal items." After McCray took the property, Montgomery

2

stopped hitting Steele and Steele stood up. Steele asked to get her belongings back and Montgomery responded, "You ain't getting shit, bitch." Steele then returned to the hotel lobby.

The hotel lobby clerk had witnessed the altercation and contacted the police. Steele testified as a result of the attack she had knots all over her head, her eyes swelled shut the next day, a blood vessel burst in her eye, and she was covered in scrapes and cuts. After arriving on the scene, Corporal Brandon Austin interviewed Steele and photographed her injuries. Austin said that Steele was "very upset" and "[s]he had been crying." Austin saw "a very large lump on her forehead" and abrasions "on her back and on the back of her legs." Steele also provided Austin with a statement regarding the night's events.

Shortly after the incident, Topeka police officer Michael Ahlstedt responded to the call and noticed a red four-door Chrysler Sebring with three people, a man, and two women, standing outside the parked car. These individuals were later identified as Childress, McCray, and Montgomery. Another Topeka police officer, Steven Christopher, determined McCray had been the driver and Montgomery was in the passenger seat.

Ahlstedt handcuffed Childress because dispatch reported that the male used a gun in the robbery, and Ahlstedt did not know where the weapon was located. McCray attempted to walk away, but Ahlstedt "was able to get her to stick around verbally." He placed Childress in his patrol car because he remained "pretty agitated." Another officer directed Ahlstedt to a firearm that had been discovered in the grass, 20 to 30 feet from the vehicle.

Sergeant Jacob Nelson of the Topeka Police Department arrived and ordered McCray and Montgomery away from Ahlstedt and asked them to sit on the curb. The pair

3

told Nelson that after partying, McCray, Montgomery, and Childress arrived back at the hotel, but that Childress' expensive glasses were missing. Montgomery asked Nelson if she could retrieve her cell phone from the car. Nelson allowed her to enter the vehicle to get her phone, but he watched her as she did so.

In the Sebring's small floorboard area on the passenger side, Christopher located two purses, one tan and one black. When he asked, both Montgomery and McCray denied any knowledge of the tan purse. Using information relayed from the officer who was with Steele, Christopher confirmed the tan purse belonged to Steele. Austin testified the other purse, the black one, did not belong to Steele but contained the iPhone, keys, and lanyard Steele had described as taken from her in the attack. Austin drove Steele to recover her phone, keys, and purse. When Steele's purse was returned to her, it contained a gun and mail addressed to Montgomery.

Ahlstedt was with the Sebring when it was towed. At the impound lot, the tow truck driver told Ahlstedt that "a strong odor of gasoline [was] coming from the vehicle" while it was being unloaded from the truck. Ahlstedt inspected the car and found multiple bullet holes in the back that were consistent with penetrations of the trunk toward the location of the fuel tank. During Ahlstedt's conversations with Childress, McCray, and Montgomery, none reported "someone firing gunshots at that vehicle."

During her testimony, Montgomery gave a slightly different version of events. She testified that she, McCray, and Childress had been out at clubs and McCray and Childress fought continually. Because McCray was intoxicated, Montgomery drove. The group stopped at an ATM and then drove back to the Plaza Inn Hotel. Montgomery parked the red Sebring next to Childress' white Crown Victoria.

Childress and McCray argued about Childress' glasses, which he claimed were in the back of the Sebring. Childress became upset and produced a gun. He stated that if

4

they could not find his glasses, McCray and Montgomery would have to pay him for them. McCray entered the Sebring, Childress followed, and he attacked McCray. Montgomery pulled Childress off McCray and McCray got out of the car.

Montgomery heard a "scuffle" behind her. She said it was McCray and another person she did not know. McCray "was leaning over [another woman] and yelling" at her. Montgomery testified she could not understand anything that McCray yelled at the person. Montgomery pulled McCray off the other woman, who was "bloody." Montgomery put McCray in the passenger side and shut the door, then she got in the driver's side and drove off. Montgomery testified Childress fired multiple gunshots at them as they drove off and the vehicle was immobilized by the gunfire, and she and McCray got out. Childress and Montgomery continued to yell at one another as police arrived.

Montgomery said the police wanted her to sit down, and she wanted her phone so she could start calling people. She believed the police had been called because of the argument with Childress waving his gun around while still at the hotel. She said she first realized she was being arrested when she was asked to leave the car to be searched. During her conversations with police, Montgomery did not mention the "scuffle" between McCray and another woman.

The jury convicted Montgomery of aggravated robbery. The district court sentenced her to serve 66 months in prison but granted Montgomery's motion for a dispositional departure. The court placed her on probation for 36 months, supervised by community corrections. Montgomery timely appeals her conviction.

ANALYSIS

Montgomery presents seven claims of error: (1) sufficiency of the evidence to convict her of aggravated robbery; (2) improper response by the district court to a jury question about guilt by association; (3) misstatement of the law when the district court read to the jury the instruction concerning aiding and abetting; (4) whether it was factually appropriate to instruct the jury on aiding and abetting; (5) misstatement by the prosecutor in argument of the law concerning the required mens rea for aiding and abetting; (6) cumulative error, depriving her of a fair trial; and (7) failure by the district court to apply the required standard for assessing attorney fees.

*I. Sufficiency of the evidence to support conviction for aggravated robbery*

Montgomery contends the State presented insufficient evidence to support her conviction for aggravated robbery.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

K.S.A. 2018 Supp. 21-5420 sets the defining elements of aggravated robbery:

> "(a) Robbery is knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person.
> "(b) Aggravated robbery is robbery, as defined in subsection (a), when committed by a person who:
> "(1) Is armed with a dangerous weapon; or
> "(2) inflicts bodily harm upon any person in the course of such robbery."

6

In this case the State prosecuted Montgomery for aggravated robbery under an aiding and abetting theory of culpability, statutorily described in K.S.A. 2018 Supp. 21-5210(a):

> "A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime."

Montgomery argues she could not be convicted under an aiding and abetting theory because there was no evidence of specific intent "that [she] acted . . . to aid McCray in the knowing taking of Steele's property."

Steele testified Montgomery prevented her from walking around the Sebring in the motel parking lot, that Montgomery told Steele, "Bitch, I don't like you, either" when Steele tried to pass by, and that Montgomery hit her in the face. Steele testified further that Montgomery continued to strike her with both fists and she fell to the ground, curled into a fetal position, and put her arms in front of her face. According to Steele, while Montgomery attacked her, McCray took her tan purse, iPhone, and keys, and put these items in the Sebring. Steele's property later was located in the Sebring directly next to Montgomery's purse, and at that time Steele's purse contained items belonging to Montgomery. The jury heard from Steele that Montgomery's attack ended only after McCray had the opportunity to take Steele's property and place it in the Sebring, and that upon Steele asking Montgomery to return her keys, she replied, "You ain't getting shit, bitch."

If the jury accepted Steele's testimony as true, it would support findings that McCray knowingly took Steele's property—a purse, phone, and keys—and McCray was able to take these items because Montgomery incapacitated Steele with a physical attack.

7

Steele's testimony would further support a finding that Montgomery's attack on Steele intentionally aided McCray in taking property from Steele by force. Steele testified she could not hold onto her property while Montgomery was hitting her. Then, after McCray put Steele's property in the Sebring, Montgomery "just stopped hitting" Steele. When Steele requested her belongings back, it was Montgomery—not McCray—who told Steele they were keeping her belongings. And Steele's tan purse was found next to Montgomery's purse in the Sebring, with Steele's property in Montgomery's purse and some of Montgomery's property in Steele's purse.

To prove culpability under an aiding and abetting theory, the State did not have to present evidence of a conversation between Montgomery and McCray plotting a joint effort to beat and rob Steele. If the jury accepted Steele's account as true and considered Montgomery's and McCray's acts, the sequence and timing of those acts, and the discovery in the purses of both Steele's and Montgomery's property, it reasonably could find that McCray knowingly took Steele's property through force and Montgomery acted intentionally to aid McCray in committing the robbery. It is not our role to reweigh the evidence, decide which witnesses to believe, or assess alternate theories. Under our standard of review, considering the evidence from the viewpoint most favorable to the State, the evidence presented was sufficient to support a reasonable finding by the jury that Montgomery was guilty.

*II. Jury question about guilt by association*

Next, Montgomery asserts the district court erred in its answer to a question from the jury about guilt by association. During deliberations, the district court received a jury question asking: "Is guilt by association sufficient to say you're guilty of aggravated robbery? On instruction number 9, which of the claims for aggravated robbery fall under association and which must be proven directly by evidence?" Instruction 9 stated the elements of aggravated robbery.

Before soliciting suggestions from counsel, the district court read a proposed response: "Members of the jury: In response to your question, the Court will refer you to the instructions as a whole for the answer to your question." Montgomery's trial counsel engaged is this exchange with the court about the proposed response:

"[DEFENSE COUNSEL]: I thought it could make some reference to instruction 8 [the aiding and abetting instruction].

"THE COURT: Yeah, but there was—

"[DEFENSE COUNSEL]: I know, but they're talking about association, and mere association, number 8 talks about that, you know.

"THE COURT: It does. I didn't want to specifically set out one instruction over another, because they reference number 9. I want to hear what you have to say. That's why I just put the instructions as a whole.

. . . .

"[DEFENSE COUNSEL]: Yeah, I think you have to do it that way, Judge, because there's more to it than just number 8. I mean, they still, they're not, I mean, the culpable mental.

"THE COURT: When you look at 8, that's aiding and abetting, but they have to apply it to 9, so I hesitate to have them look at just, or just to set out any one or two specific instructions, because they only need—they need to review those as a whole. *Are you satisfied with the answer, then, in referring them to all the instructions, basically, for the answer to that question?*

"[DEFENSE COUNSEL]: *Yeah. I mean, I think there is more to this than just number 8.*

"THE COURT: And we certainly may get another question. I don't know.

"[DEFENSE COUNSEL]: *Right, I think we just, I think that's the way to put it, Judge, to refer to it.*" (Emphases added.)

Montgomery now claims that although the district court did not misstate the law by referring to the instructions generally, it "abused its discretion by providing an insufficient response under the circumstances." She argues the jury question was really two individual questions that necessitated individual answers. Montgomery contends the

9

first question, asking whether guilt by association was sufficient "to say you're guilty of aggravated robbery," required a simple negative response. She contends the second part of the jury's question—"On instruction number 9, which of the claims for aggravated robbery fall under association and which must be proven directly by evidence?"—the proper answer would have been to reply that all the claims must be supported by evidence and to direct the jury to Instruction 8 concerning guilt under a theory of aiding and abetting. When it did not address the jury's question the way she now suggests, Montgomery claims "the court left the jury as confused as when they submitted the question" and argues that "[h]ad the jury known Ms. Montgomery had to act with the intent to further the robbery, it likely would have acquitted" her.

We review a district court's response to a jury question during deliberations for abuse of discretion. *State v. Adams*, 292 Kan. 151, 163, 254 P.3d 515 (2011). However, a litigant may not invite error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). Whether the doctrine of invited error applies presents a question of law, and appellate courts generally exercise unlimited review over questions of law. *State v. Hankins*, 304 Kan. 226, 230, 372 P.3d 1124 (2016).

In *State v. Stewart*, 306 Kan. 237, 393 P.3d 1031 (2017), the jury asked for a definition of "the use of force" in taking property. Defense counsel told the district court: "I think the best thing to do is just to have the jury refer back to the jury instructions. They've already been instructed on the law. . . . *Everything that we wanted to have in there is in that jury instruction packet*." 306 Kan. at 249-50. The Supreme Court found defense counsel's assertions precluded a claim on appeal that the instructions were clearly erroneous. 306 Kan. at 250; see also, *State v. Bruce*, 255 Kan. 388, 397-98, 874 P.2d 1165 (1994) (holding defendant could not claim error when his trial counsel participated with district court to prepare response to jury question requesting written transcripts of testimony and approved court's answer); *Adams*, 292 Kan. at 164-65 (even though district court judge "play[ed] with fire" by creating written summary of witness testimony

10

approved by counsel instead of offering readback in response to jury question, defendant invited any error that occurred and was not entitled to review); *State v. Cramer*, 17 Kan. App. 2d 623, 633, 841 P.2d 1111 (1992).

As in *Stewart* and the other cases above, Montgomery's trial counsel discussed and ultimately concurred with the district judge's proposed response. Under those facts, Montgomery may not now claim the district court committed error in giving that response to the jury.

*III. District court's misreading of the instruction on aiding and abetting*

Both Montgomery and the State agree that when the district court read the instructions to the jury, the court misread the one explaining the law governing the culpability of someone aiding and abetting the commission of a crime by another person. Jury instruction No. 8, as drafted and given to the jury, stated:

> "A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime.
> "All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is *insufficient* to make a person criminally responsible for the crime." (Emphasis added.)

The district court's oral delivery of this instruction's final sentence, however, differed from the written version: ". . . however, mere association with another person who actually commits the crime or mere presence in the vicinity of a crime *is enough* to make a person responsible for the crime." (Emphasis added.)

11

Montgomery argues the fact "the court gave a correct written version . . . to the jury did not correct the error created when the court incorrectly instructed the jury orally from the bench." She further contends the jury question discussed above showed confusion was created by the differing oral and written instructions.

> "When analyzing jury instruction issues, we follow a three-step process:
>
> "'(1) determining whether the appellate court can or should review the issue, *i.e.,* whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.,* whether the error can be deemed harmless.'
>
> . . . .
>
> "The 'first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect [this court's] reversibility inquiry at the third step.' [Citations omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

At the second step of that analysis, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. 307 Kan. at 318.

When the clear error standard applies at the third step because a party did not object to the jury instruction below, we will only reverse the district court if an error occurred and we are firmly convinced the jury would have reached a different verdict if the instruction error had not occurred. The party claiming a clear error has the burden to demonstrate the necessary prejudice. 307 Kan. at 318.

Since Montgomery acknowledges there was no contemporaneous objection to the misreading of the written instruction, we apply a clear error standard under the third step of the analysis. K.S.A. 2018 Supp. 22-3414(3); *McLinn*, 307 Kan. at 317. And the State admits there was error when the trial court incorrectly read the instruction, so the second

part of the analysis is also undisputed. Finally, we must determine the level of prejudice, if any.

For that prejudice analysis, Montgomery points us to *State v. Castoreno*, 255 Kan. 401, Syl. ¶ 4, 874 P.2d 1173 (1994), as she contends "the fact that the court gave a correct written version of the instruction to the jury did not correct the error created when the court incorrectly instructed the jury orally from the bench." In *Castoreno*, the district court gave an instruction for witness credibility that contained significant additions to the pattern instruction, drawn from appellate cases. The defendant did not object. The Supreme Court specifically disapproved all that was added to the pattern instruction, and held it was error to give the expanded instruction, but not clear error. 255 Kan. at 403-05, 407.

Additionally, the court in *Castoreno* found error in the district court's instruction on aggravated criminal sodomy, concluding that "of the two essential elements at issue, one was omitted from the instruction and the other one was incorrect." The court observed, "[t]he instruction did not use the words of the statute or of the pattern instruction on the element involving force or fear." 255 Kan. at 409. The court found the cumulative effect of the two instruction errors *was* clearly erroneous and reversible. 255 Kan. at 411.

In *State v. Butler*, No. 112,723, 2016 WL 1614167, at *5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1321 (2017), the district court orally instructed the jury: ""'[s]odomy means *any* penetration, however slight, of a male by any body part or object"'" instead of ""'*anal* penetration."'" But the court also affirmatively instructed the jury to rely on the written instructions, which were correct. 2016 WL 1614167, at *6. Because the jury was told to rely on the written instructions, which were correct, the panel in *Butler* was "not persuaded the district court erred" at all and, if it was error, the error was harmless because "there [was] no evidence in the record that [the

13

defendant] penetrated [the victim's] body in any manner other than anally," eliminating any possibility the jury relied on the district court's incorrect oral instruction. 2016 WL 1614167, at *6.

Here, the district court incorrectly stated that mere association with a perpetrator or mere presence in the vicinity of a crime *is enough* to make a person criminally responsible. However, the written instruction properly directed the jury that mere association or presence alone were insufficient to make Montgomery culpable for the crime. In *Butler* the district court specifically told the jury to consider the written instructions in the event of any misstatement. Similarly, in response to the jury's question about "guilt by association," the district court in this case told the jury to reference the written instructions "as a whole"—not to rely on what had been presented orally.

Because the district court in *Castoreno* failed twice, to a significant degree, to correctly instruct that jury, we fail to see a persuasive level of equivalence to the facts before us. The multiple errors in *Castoreno* combined to lead the Supreme Court to the conclusion it could not "say with firm conviction that absent the two erroneous instructions, the jury would have returned the same verdict." 255 Kan. at 411. The single misreading here not only was countered by the accurate written instruction provided to the jury when it went to its deliberations, but also was reaffirmed in the response to the jury's question. We are not firmly convinced the jury would have reached a different verdict if the error had not occurred and, therefore, conclude the error was harmless.

*IV. Factual appropriateness of aiding and abetting instruction*

Montgomery next claims the aiding and abetting instruction was not factually appropriate because "there was no evidence, even in the light most favorable to the State, that she hit Steele so that McCray could take her personal property." During the trial, Montgomery made that argument in objecting to the State's proposed instruction on

14

aiding and abetting. The district court overruled Montgomery's objection, with this explanation:

"Okay. I'm going to give the aiding and abetting instruction, because there is evidence that the jury could find that the defendant aided and abetted Miss McCray in the theft of the property, which was, I say the theft of the property as an element of the robbery in this case. That property of the victim did end up in Miss McCray's, the phone ended up in the car, and the two purses that were in the car, and there was items belonging to the victim in the defendant's purse.

. . . .

"Now, I know your client testifies she doesn't know how it got there, she didn't put it there, and that's for the jury to determine, you know, but they could find, based on all the evidence, that that's an aiding and abetting. I'm not going to give the second paragraph. That's the person [who] is also responsible for any other crime committed. I am going to give the third paragraph, 'all participants in a crime are equally responsible; however, mere association with another person that commits a crime, or mere presence is strong enough to make the person responsible for the crime.' I'm going to have that drawn up."

If a party preserves its objection to the instructions at trial and the appellate court determines the district court erred in ruling on that objection, and the error did not violate a constitutional right, the error requires reversal only if the court determines there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016).

Montgomery's objection to the instruction addresses the first step of the *McLinn* analysis. It is at the second step that we consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. 307 Kan. at 318. Montgomery grants that "it was *legally* appropriate to give the . . . aiding and abetting instruction as, legally, a defendant may be found guilty of aggravated robbery based on a

15

theory of aiding and abetting." She maintains, however, it was not *factually* appropriate to do so.

Montgomery argues that "even in the light most favorable to the State, no evidence suggest[s] that Ms. Montgomery attacked Steele with the purpose of facilitating a robbery." Montgomery argues we should accept the dubious *post hoc* proposition that, since Steele testified Montgomery began hitting her *after* saying "Bitch, I don't like you, either," Montgomery, therefore, "attacked [Steele] *because* [Montgomery] didn't like her, and for no other reason." (Emphasis added.) Although she admits some of her belongings and Steele's were mixed in the two purses, Montgomery contends "[t]he mere presence of the items in Ms. Montgomery's purse . . . doesn't indicate she aided and abetted in the theft."

We find the facts clearly supported the district court's decision to instruct on aiding and abetting. As discussed above, the facts, viewed in the light most favorable to the State, could provide a basis for the jury to find Montgomery intentionally assisted and enabled McCray to carry out the taking of Steele's property by force. Montgomery attacked Steele; she continued the attack until McCray had deposited Steele's belongings in the car, when she abruptly stopped hitting Steele; she emphatically denied Steele the return of her property; and Steele's property was found in Montgomery's purse, while some of Montgomery's items were in Steele's purse. A reasonable juror may well have concluded that Montgomery acted with the intent to aid and facilitate an aggravated robbery, making the instruction factually appropriate.

*V. Prosecutor comments in closing*

Montgomery's next alleged error concerns the prosecutor's closing arguments. Montgomery claims these statements "eliminated the need for a *mens rea* to commit

16

robbery by aiding and abetting and therefore diluted the burden of proof." Montgomery directs us to three parts of the State's closing:

- "When we talk about the concept of aggravated robbery, essentially, there are three elements beyond the issue of the date. We have a knowing taking of property. We have a taking that was by threat of bodily harm to [LaMonica] Steele, and that the defendant inflicted bodily harm on any person.

  "Look at those three components. The important factor for you, the jury, to bear in mind is this: You have two individuals who are acting in concert with one another, so you do not have one individual who is carrying out the bodily injury to LaMonica Steele, as well as the theft, you have the defendant, Catriece Montgomery, who is carrying out that battery, the physical contact that resulted in that bodily harm to LaMonica Steele, and as she's doing that, we have Shabre McCray, who is removing those personal items of property from her person, and she also does engage in the physical battery of LaMonica Steele.

  "*Having said that, I wanted you to have some understanding of the legal variables that come into play when you go through and analyze these facts so that you have some understanding. We do not have two separate crimes being committed here. We do not have Catriece Montgomery who's committed a battery, and then separately we have Shabre McCray who has committed a theft of property. We have two individuals who are aiding and abetting one another and who are acting in concert to carry out this crime, and it's the combination of that battery with that theft that creates the crime of aggravated robbery. That is the very definition of aggravated robbery.*" (Emphasis added.)

- "You *know* that basically, the state of the defendant's mind or I should say frame of mind and Shabre McCray and Kendall Childress, it was nothing about anger and aggression there, and LaMonica Steele happened to be the conduit that that aggression ended up being directed toward by two females who are *confronted by a very aggressive male, and they attacked and they stole her items. The fact that they didn't come together and stand over to the side of the car and say, you know what? Let's go attack her, let's take her items and let's leave, that is not the element. The elements, very simply, was there a taking of property? Yes. Was there a threat of*

17

*bodily force? Yes. Was there bodily injury that was committed? And the answer is yes. So don't get confused when you think about that.*" (Emphasis added.)

- "The gun simply ended up being there. Who put it there? We don't know. Does it matter? No, because what needs to be answered? Were items taken from LaMonica? Yes. Was there a threat of bodily harm? Yes. And was there bodily injury? Yes. That gun has no bearing on those issues for you to decide."

Concerning the first segment, Montgomery claims the prosecutor erred because she:

"[I]mplied that Ms. Montgomery need not act with any intent to take the property, or knowledge that she was facilitating McCray's taking of the property to be guilty of the offense. According to the prosecutor, so long as McCray knowingly took the property and Ms. Montgomery knowingly attacked Steele, the elements of the crime are satisfied."

Montgomery continues, arguing that "[t]wo people can simultaneously commit a theft and a battery without aggravated robbery occurring." She concludes:

"Simply because two people potentially separately committed crimes on the same individual does not mean they automatically combine to create a more serious offense. While they certainly *could* be so combined, the prosecutor erred by telling the jury that they *had* combined because that was 'the very definition of aggravated robbery.'"

Regarding the second statement by the prosecutor, Montgomery claims "a key element is the *mens rea*" and the prosecutor's failure to include this element in the list she gave the jury could effectively impose strict liability on Montgomery for McCray's theft. Finally, Montgomery contends that although the third section of argument "correctly stated *some* of the questions the jury needed to focus on, and correctly noted that the gun wasn't relevant," it "negated the *mens rea* by not including it in [the prosecutor's] recitation of *the* questions the jury had to answer."

18

We examine a claim of prosecutorial error with a two-step process:

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial.
>
> "In evaluating the prejudice step of our two-step analysis for reversible prosecutorial error, appellate courts shall look no further than, and shall exclusively apply, the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Sherman*, 305 Kan. 88, Syl. ¶¶ 7-8, 378 P.3d 1060 (2016).

Here, we find no error when considering the prosecutor's statements in fuller context. Read in isolation, the first allegedly erroneous section seems to imply there is no mens rea requirement for an aggravated robbery conviction on an aiding and abetting theory. But immediately before making the statements highlighted by Montgomery the prosecutor specifically discussed the mens rea requirement. Combining the statements, the prosecutor told the jury:

> "Now, when you consider the commission of a crime, there are instances where you have a single individual who will be involved in the commission of a crime. When you have a crime that is committed where you have two individuals involved in the commission of the crime, that's where the theory of aiding and abetting comes into play, and that's Instruction Number 8 that [the Judge] read to you that says a person is criminally responsible for a crime if the person, either before or during its commission, *and with the mental culpability required to commit the crime, intentionally aids another to commit the*

*crime*. All participants in a crime are equally responsible without regard to the extent of their participation.

"The facts of this case disclose that the crime committed against LaMonica Steele involved two individuals. That was Catriece Montgomery and Shabre McCray, and so therefore the theory of aiding and abetting comes into play, and that's why you have that as a jury instruction.

"Now, I want also to talk with you about the elements of aggravated robbery. When we talk about the concept of aggravated robbery, essentially, there are three elements beyond the issue of the date. We have a *knowing* taking of property. We have a taking that was by threat of bodily harm to [LaMonica] Steele, and that the defendant inflicted bodily harm on any person.

"Look at those three components. The important factor for you, the jury, to bear in mind is this: You have two individuals who are *acting in concert with one another*, so you do not have one individual who is carrying out the bodily injury to LaMonica Steele, as well as the theft, you have the defendant, Catriece Montgomery, who is carrying out that battery, the physical contact that resulted in that bodily harm to LaMonica Steele, and as she's doing that, we have Shabre McCray, who is removing those personal items of property from her person, and she also does engage in the physical battery of LaMonica Steele.

"Having said that, I wanted you to have some understanding of the legal variables that come into play when you go through and you analyze these facts so that you have some understanding. We do not have two separate crimes being committed here. We do not have Catriece Montgomery who's committed a battery, and then separately we have Shabre McCray who's committed a theft of property. We have two individuals who are aiding and abetting one another and who are acting in concert to carry out this crime, and it's the combination of that battery with that theft that creates the crime of aggravated robbery. That is the very definition of aggravated robbery." (Emphases added.)

The second of the prosecutor's statements that Montgomery highlights likewise omits the prosecutor's discussion of culpable mental state. In fact, Montgomery's second excerpt also begins just after the prosecutor addressed culpable mental state. Again, an expanded excerpt from the argument:

20

"Another point. Counsel talks about *where is the evidence of a culpable mental state on behalf of Catriece Montgomery*? The way that argument is phrased suggests that there has got to be a temporal aspect to a decision to commit a crime, and when I talk about a temporal aspect, the argument suggests that somebody has to sit down and has to ponder for an extended period of time their desire to commit a crime, and once they pondered that, then they go forward and carry that out. That's not true at all. People commit crimes all the time on the spur of the moment. You know that basically, the state of the defendant's mind or I should say frame of mind and Shabre McCray and Kendall Childress, it was nothing about anger and aggression there, and LaMonica Steele happened to be the conduit that that aggression ended up being directed toward by two females who are confronted by a very aggressive male, and they attacked and they stole her items. The fact that they didn't come together and stand over to the side of the car and say, you know what? Let's go attack her, let's take her items and let's leave, that is not the element. The elements, very simply, was there a taking of property? Yes. Was there a threat of bodily force? Yes. Was there bodily injury that was committed? And the answer is yes. So don't get confused when you think about that. There just has to be pre-planning." (Emphasis added.)

Montgomery's characterization of the prosecutor's third statement is, again, too restricted. In her brief, Montgomery frames this statement as if the prosecutor was telling the jury the elements of the crime of aggravated battery and failed to mention the mental state required for conviction: "Were items taken from LaMonica? Yes. Was there a threat of bodily harm? Yes. And was there bodily injury? Yes."

But the prosecutor's statement in this section of argument focused on the role, or lack of a role, of the testimony about the presence of the guns:

"The gun, I would like to talk about the topic of the gun. LaMonica made it very clear. The gun never came into play. Either gun, you've got a black gun in the photograph and you've got a silver gun in the photograph. Kendall Childress never used that gun against her. Kendall Childress was never involved in an aggravated battery. He was

21

waving that gun around and he was directing his anger at Catriece Montgomery and Shabre McCray. LaMonica told you that at no point in time did Kendall Childress ever become involved with her or even her with the gun, and you saw that issue clarified later on when Corporal Austin contacted her. When you heard him sending information to that officer down at the secondary scene, his assumption was that Kendal had been using that gun against her. And later on, he said that no, he had not been using that gun against her. The gun simply ended up being there. Who put it there? We don't know. Does it matter? No, because what needs to be answered? Were items taken from LaMonica? Yes. Was there a threat of bodily harm? Yes. And was there bodily injury? Yes. That gun has no bearing on those issues for you to decide.

"The gun being in her purse, somebody had the gun, she told you she didn't have the gun. Law enforcement is coming to the scene, and Catriece told you that they were able to see the sirens or could hear the sirens of law enforcement officers coming to the area. You've seen the diagram, you've seen Kansas Avenue, you know that there is no obstructions there.

. . . .

"At one point in time, there was concern showed about a gun, and Sergeant Nelson said what's the problem with the gun? Miss Steele wasn't allowed to have guns. Who put that gun there? We don't care, because it's not relevant to the issue of robbery. That's really what you need to do for purposes of your analysis."

We find the prosecutor clearly explained the requisite mens rea required for Montgomery's aggravated robbery conviction, reading directly from the aiding and abetting instruction and, taken as a whole, we do not find the prosecutor misled the jurors concerning the need for that mental state in later comments. As there was no error, there is no need to consider the matter of prejudice. See *Sherman*, 305 Kan. at 109.


*VI. Cumulative error*


Next, Montgomery alleges that the cumulative errors, even if individually harmless, "deprived Ms. Montgomery of a fair trial." As we have identified only the single error of when the district court misread the aiding and abetting instruction to the

jury, which we found to be harmless, there can be no "cumulative" error. A single error cannot support reversal under the cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

*VII. Order for reimbursement of attorney fees*

Montgomery's final claim is that the district court failed to "meaningfully consider" her resources when it ordered her to reimburse BIDS for her representation over the course of the case. She acknowledges that, after inquiry, the district court made a finding concerning her ability to pay, but asserts the court failed to explain "how it reached the maximum number that it did," failed to consider the burden reimbursement would place on her, and failed to specify on the record how it weighed the factors to arrive at the ordered amount.

K.S.A. 22-4513 directs both the BIDS reimbursement and the process for making the determination:

> "(a) If the defendant is convicted, all expenditures made by the state board of indigents' defense services to provide counsel and other defense services to such defendant or the amount allowed by the board of indigents' defense reimbursement tables as provided in K.S.A. 22-4522, and amendments thereto, whichever is less, shall be taxed against the defendant and shall be enforced as judgments for payment of money in civil cases.
> "(b) In determining the amount and method of payment of such sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." K.S.A. 22-4513.

Both parties agree this issue is a question of law over which our review is unlimited. *Robinson*, 281 Kan. at 539.

23

In *Robinson*, the Supreme Court succinctly stated its interpretation of how K.S.A. 22-4513 must be implemented by a district court:

"[T]he sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly,* stating on the record how those factors have been weighed in the court's decision. Without an adequate record on these points, meaningful appellate review of whether the court abused its discretion in setting the amount and method of payment of the fees would be impossible." 281 Kan. at 546.

At sentencing in this case, the district court engaged in the following discussion with Montgomery:

"THE COURT: I know you are working. How much are you grossing a week? That's before they take out anything.
"DEFENDANT MONTGOMERY: Well, yes they do.
. . . .
"[DEFENSE COUNSEL]: How much do you get paid an hour?
"THE COURT: How much to you get paid an hour?
"DEFENDANT MONTGOMERY: $9.75
"THE COURT: Okay. That's—and then, you are working 40 hours or more?
"DEFENDANT MONTGOMERY: Forty hours, now. She has other help, but I'm not even going back on the schedule until August 1st, because I've had pinkeye for several weeks, so they had to get somebody in there to replace me, but they are not permanent. They're just—came in through an agency to fill in hours.
. . . .
"THE COURT: . . . I do find that you have the ability to pay court costs and fees in this case. I'm gonna assess court costs at $171, the surcharge is $22, the probation fee is a $120. There is a KBI DNA fee of $200.
"I have looked it up, and it appears that the tried felony case for this level is $2,800, so you will be assessed $2,800 for attorneys fees, $100 for the application fee in this case."

The district court considered Montgomery's financial resources—her income from employment—but made no inquiry about the potential burden of repayment. Neither the statute nor *Robinson* leaves room for us to assume or speculate that the district court engaged in a consideration of the burden reimbursement might impose on Montgomery. The Supreme Court has reiterated and emphasized the requirements for a district court to satisfy the direction of this statute:

"As our holding in *Robinson* repeatedly made clear, in order to determine the amount of defendant's payment of BIDS reimbursement, at sentencing the court is required to take account of the defendant's financial resources and the nature of the burden that payment of such sum will impose explicitly. Moreover, the court must state on the record how those factors have been weighed in the court's decision, *i.e.,* determining how much of a fee, if any, to impose. Indeed, we stated that '[w]ithout an adequate record on these points, meaningful appellate review of whether the court abused its discretion *in setting the amount . . . of the fees would be impossible.*'" *State v. Drayton*, 285 Kan. 689, 716, 175 P.3d 861 (2008).

The district court's failure to make an explicit record of the nature of the burden reimbursement would place on Montgomery and its considerations in weighing her financial resources against that burden to arrive at the ordered amount precludes any "meaningful appellate review." As a result, we must remand this case to the district court for further proceedings solely on this issue.

Affirmed in part, vacated in part, and remanded in part with directions.

25